928 F.2d 592
 Maria RIVERA, Angel Santana, Diana Penaloza Arce, Enrique
Arce, Santiago Mendez and Carmen Mendez,
Plaintiffs-Appellants,
v.
UNITED STATES of America; United States Department of
Justice Drug Enforcement Administration; various named
officers, including Special Agents Colon, Rivera, Timothy
Sullivan, Wnukowski and Gabriella Zacco, Detectives Beck,
Becheck, Casuso, Cebarello, Jones, Larkin and Velez,
Investigators James J. Boylan, Robinson, Robert Robles,
Rohman and Welch, Sergeants Cook and Murray, and John Doe
and Jane Doe, et al., unknown officers and agents,
Defendants-Appellees.
 No. 714, Docket 90-6171.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1990.
Decided March 21, 1991.
 
 John D.B. Lewis, New York City for plaintiffs-appellants.
 Edward T. Ferguson, III, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Marla Alhadeff, Asst. U.S. Atty., New York City, on the brief), for defendants-appellees.
 Leon Friedman, Lewis M. Steel, New York City (Steel & Bellman, Arthur N. Eisenberg, New York Civil Liberties Union, Kenneth Kimerling, Puerto Rican Legal Defense and Educ. Fund, Inc., New York City, of counsel), filed a brief for amici curiae New York Civil Liberties Union and Puerto Rican Legal Defense and Educ. Fund, Inc.
 Before TIMBERS, KEARSE and MINER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Maria Rivera et al. appeal from a final judgment of the United States District Court for the Southern District of New York, Michael B. Mukasey, Judge, dismissing their complaint which sought damages from the United States, certain of its law enforcement agents, and the United States Drug Enforcement Administration ("DEA"), principally for violation of plaintiffs' rights to be free from unreasonable searches and seizures in violation of the Fourth Amendment to the Constitution, for ethnic discrimination in violation of the equal protection component of the Due Process Clause of the Fifth Amendment to the Constitution and 42 U.S.C. Secs. 1981 and 1982 (1988), and for various common-law torts, resulting from defendants' execution of search warrants for plaintiffs' apartments. With respect to the Fourth Amendment claims, the complaint alleged principally (1) that the warrants were invalid because (a) they were issued upon a facially insufficient affidavit, or (b) the affidavit upon which they were issued contained deliberate or reckless falsehoods, and (2) that the warrants were executed with excessive force and intrusiveness. The district court summarily dismissed virtually all of plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(6) and 56. On appeal, plaintiffs contend that the record revealed genuine issues of fact that should have precluded the entry of summary judgment and that the district court improperly denied them discovery. For the reasons below, we affirm so much of the judgment as (a) dismissed the statutory and constitutional equal protection claims, (b) dismissed the common-law tort claims against the individual defendants, and (c) dismissed all claims against the DEA and defendant Velez. We vacate so much of the judgment as (a) dismissed the Fourth Amendment claims against the individual defendants other than Velez, and (b) dismissed the common-law tort claims against the United States, and we remand for further proceedings.
 
 I. BACKGROUND
 
 2
 The present litigation has its origins in the predawn execution of search warrants in an apartment building at 143 Bruce Avenue in Yonkers, New York ("143 Bruce" or the "building"), on January 8, 1987. The 50-apartment racially integrated building, which had become a cooperative in 1986, was occupied by both renters and owners. Plaintiff Maria Rivera owned and resided in apartment 3D; at the time of the raid, plaintiff Angel Santana was visiting her. Plaintiffs Santiago and Carmen Mendez rented and resided in apartment 2F. Plaintiffs Enrique and Diana Penaloza Arce owned and resided in apartment 2J with their then 5-month old son; they also owned the adjacent apartment, 2A, which they rented to others.
 
 
 3
 Viewed in the light most favorable to plaintiffs, the record reveals the following.
 
 A. The Warrants and the Searches
 
 4
 On January 7, 1987, defendant James J. Boylan, a New York State Police Investigator assigned to the New York Drug Enforcement Task Force ("NYDETF"), applied to a United States magistrate for a warrant to search certain apartments, including seven at 143 Bruce. Boylan submitted an affidavit dated January 7 ("Boylan affidavit"), detailing the basis for the application and stating, in pertinent part, as follows.
 
 
 5
 Boylan had been working for several months on an ongoing investigation of what he believed to be a major cocaine and "crack" distribution organization in the Bronx, New York, supervised by citizens of the Dominican Republic ("Dominican organization"). He had received information from several confidential sources, one of whom (the "informant") had previously supplied him with information related to this and other investigations. The informant's information in other matters had led to raids in the Bronx in October 1986, resulting in the seizure of weapons and large quantities of narcotics, and the arrest and prosecution of drug suspects.
 
 
 6
 Subsequent to those October raids, the informant had learned from Carlos Molina, one of the leaders of the Dominican organization, that the organization was moving its headquarters from the Bronx to 143 Bruce. Boylan knew that that building had a history of narcotics activity, although as far as he knew, none of that activity had been connected to the Dominican organization.
 
 
 7
 The Boylan affidavit stated that in "the past week" the informant had reported to Boylan that one of the members of the Dominican organization had said the group was expecting a shipment of cocaine to arrive at 143 Bruce on January 7. The informant provided information with respect to seven apartments in the building. Apartment 4F was Molina's residence; the informant had been in 4F several times within the past several weeks, had seen 1/8 kilogram of cocaine there, and had observed sales of cocaine totaling several kilos; in addition, he had observed cocaine and another member of the Dominican organization in apartment 3B; had observed Molina in apartments 3B and 2A; and had observed another Hispanic male carry cocaine from apartment 2H to apartment 2A. Subsequent to these observations, Molina had told the informant "in substance" that apartments 2A, 2F, 2H, 2J, and 3D were used in the drug operation. The informant also observed Molina use keys to open the doors to three of those apartments, including 2F and 2J.
 
 
 8
 The application sought search warrants for, inter alia, the seven apartments at 143 Bruce as to which the informant had provided information. The affidavit stated that Boylan had checked the Con Edison records for each of these apartments but that, except for apartment 4F, none of the names in those records was familiar to him. In Boylan's experience, however, the unfamiliarity of the names was not unusual since "sophisticated drug traffickers frequently use other people, real or fictitious, as subscribers, registrants, and/or agents, in order to conceal their own identities."
 
 
 9
 The requested search warrants were issued by the magistrate. In addition to authorizing the seizure of narcotics and narcotics paraphernalia, they authorized the seizure of documents and other evidence of violations of the federal narcotics laws or the fruits of such offenses. The warrants allowed the searches to take place at any hour of the day or night.
 
 
 10
 The searches of the seven targeted apartments at 143 Bruce took place virtually simultaneously, shortly before 6 a.m. on January 8. With respect to plaintiffs' apartments, 2F, 2J, and 3D, teams of officers entered forcibly and restrained plaintiffs for as much as two hours while they searched the apartments thoroughly. The degree of force used to enter, restrain, and search is in dispute. It is undisputed, however, that though the searches turned up small amounts of marijuana in apartments 2A and 2F, and about 102 grams of cocaine in apartment 2H, the officers found no semblance of the anticipated shipment of cocaine in any apartments at 143 Bruce.
 
 B. The Complaint and the Motions To Dismiss
 
 11
 After unsuccessfully filing administrative claims under the Federal Tort Claims Act, 28 U.S.C. Sec. 2671 et seq. (1988) ("FTCA"), plaintiffs commenced the present action in the spring of 1988 against the United States, the DEA, Boylan, and other law enforcement officers allegedly involved in the searches. The complaint alleged principally that the procurement and execution of the warrants with respect to plaintiffs' apartments violated their rights under the Fourth Amendment; that the selection of their apartments for search was the product of ethnic discrimination, in violation of their equal protection rights under the Fifth Amendment and 42 U.S.C. Secs. 1981 and 1982; and that defendants were liable for various common-law torts, including trespass, assault, battery, and intentional infliction of emotional distress.
 
 
 12
 Plaintiffs promptly sought discovery of the government, including depositions of Boylan and his informant. The government opposed, stating that it intended to file motions to dismiss. The court stayed discovery of the government pending those motions.
 
 
 13
 In October 1988, the individual defendants moved to dismiss pursuant to Rule 12(b)(6) for failure to state a claim or, alternatively, under Rule 56 for summary judgment. In support of the motion for summary judgment, Boylan submitted two sworn declarations dated October 6, 1988, and August 15, 1989, respectively, supplementing certain of the statements made in the Boylan affidavit submitted in support of the application for the search warrants. Thus, he stated that Molina had been the source of all of the informant's information; that the information as to the expected shipment of cocaine had been received at a Christmas party in Molina's apartment; and that much of the information as to specific apartments had been received at a New Year's Eve party, when Molina was consulting the informant with regard to the possible installation of an alarm system and video cameras to guard against surprise raids by law enforcement officials. When the informant told Molina he would have to see the apartments involved, Molina showed him apartments 2A, 2F, 2H, 2J, 3B, 3D, and 4F. The informant observed Molina using keys to open the doors to apartments 2F, 2H, and 2J. Soon after leaving Molina's presence, the informant made a written list of the apartments shown him by Molina; he later read the list to Boylan. Boylan stated that he had deliberately omitted from his search warrant affidavit such details as he thought might reveal the informant's identity and place the informant in jeopardy.
 
 
 14
 Sworn declarations in support of summary judgment were submitted also by defendants Timothy Sullivan, Thomas Murray, and William Cook, the officers who, respectively, had headed the teams of agents who entered and searched the Mendezes' apartment (2F), the Arces' apartment (2J), and Rivera's apartment (3D). Each of these officers stated that in executing the search warrant for these apartment the agents had
 
 
 15
 followed standard procedures. We gathered outside the door to the apartment. I knocked loudly on the door and [identified myself as a police officer] in a loud voice.... We waited for a brief period of time--less than a minute--for someone to come to the door.
 
 
 16
 The declarations of Murray and Cook, with respect to apartments 2J and 3D, continued, "[h]earing no response from inside the apartment, we struck the door with a battering ram"; the declaration of Sullivan, with respect to apartment 2F, stated, "[w]e were about to strike, or had just struck, the door with a battering ram when one of the occupants of the apartment opened the door." Sullivan, Murray, and Cook stated that the searches had been thorough but neat. Murray, who led the search of 2J, stated that Mrs. Arce "did not complain to us about how the search was conducted." Cook, who led the search of 3D, stated that Rivera had been wearing a nightgown and had been searched by one female agent in the bathroom.
 
 
 17
 In opposition to defendants' motions, plaintiffs contended, inter alia, that the search warrants were invalid for a number of reasons. They contended that they were improper because they were "anticipatory" warrants, not warrants based on existing facts. They also argued that the Boylan affidavit was insufficient to justify the issuance of the warrants because it failed to disclose certain facts. For example, it did not state the date on which the informant told Boylan the shipment was expected, creating the possibility that Boylan's information was stale. In addition, they argued that since certain of the informant's information had been received at holiday parties, the information might have been distorted by intoxication. Plaintiffs also contended that after the informant identified their apartments, Boylan should have checked further and would have learned that plaintiffs (a) were not from the Dominican Republic, and (b) had been residents of 143 Bruce before the Dominican organization moved there.
 
 
 18
 In addition, plaintiffs submitted affidavits giving their versions of the execution of the warrants. Rivera and Santana stated that they were awakened by loud banging noises coming from somewhere other than Rivera's apartment. Moments later they heard even louder banging on Rivera's own door. Rivera and Santana went to the door, asking who was there and what they wanted, and shouting, "Stop!" The battering did not stop until the door was broken in. Prior to battering the door to 3D, the agents had not knocked or identified themselves.
 
 
 19
 Seeing nonuniformed people with drawn guns in the hallway outside the apartment, Rivera and Santana ran into one of the bedrooms. The officers pursued them and forced them to lie on the floor with their hands behind their heads. When Rivera attempted to ask the officers why they had broken into her home, one of them forced her head to the floor with his foot, aimed his shotgun at her head, and told her to be quiet.
 
 
 20
 After a minute or two, Rivera and Santana were told to stand, and Rivera was patted down and given a copy of the search warrant. Santana, wearing only underpants, was taken out of the bedroom in painfully tight handcuffs. Three female officers required Rivera, who was wearing a T-shirt, sweat pants, and underwear, to strip in front of a window that was covered only by a nearly transparent curtain; she was too frightened to protest. After the strip-search, Rivera was allowed to dress and was taken into the living room where her hands were handcuffed behind her back. At this point, Santana was allowed to get dressed and was then rehandcuffed. The search of 3D lasted approximately one-and-one-half hours. When the officers departed they took with them Rivera's bank statements, her wallet with all her personal identification, family photographs, and other personal papers of Rivera and Santana. The officers left the contents of every drawer and closet strewn around; furniture was upended; and some of Rivera's young son's toys were pulled apart and broken. No drugs were found.
 
 
 21
 The affidavit of Diana Penaloza Arce ("Arce") stated that on the morning of January 8, her husband was at work when Arce heard a loud banging at her front door, 2J. Frightened, Arce picked up her son and went to the front door, crying, "please stop, there's a baby here!" When the door started splintering from its frame, Arce could see people in the hallway and offered to open the door, but she could not because it had already been knocked off its hinges. The door was then knocked in, just missing Arce and the baby. The officers rushed into the apartment with drawn guns. Prior to the battering of Arce's door, they had not knocked or identified themselves.
 
 
 22
 Arce was not allowed to telephone her husband or a relative who was a police officer. When one of the officers asked Arce how long she had lived there, she responded that she and her husband had purchased the apartment, as well as the apartment next door. The officer commented in a disparaging way that those purchases must have required a lot of money. The search of the Arce apartment lasted approximately two hours, and the officers left the apartment in disarray. No drugs were found.
 
 
 23
 The affidavits of Santiago and Carmen Mendez, who had lived in apartment 2F since 1975, stated that on the morning of January 8, they had arisen and were preparing breakfast when the police began smashing their door with a battering ram. Santiago Mendez opened the door within seconds of the commencement of the battering. As he opened the door, the officers entered with guns drawn. Santiago asked the officers what the problem was but was given no information. Prior to ramming the door, the police had neither knocked nor identified themselves.
 
 
 24
 In response to police questioning, Santiago acknowledged having a small quantity of marijuana in the apartment. At one point during the search, an officer saw an open box of cereal in the refrigerator and asked the Mendezes if they had roaches. The search of the Mendezes' apartment lasted two hours. The Mendezes' possessions were tossed about and some of their property was damaged. No cocaine was found.
 
 
 25
 All of the plaintiffs stated that they had never heard of any of the members of the Dominican organization and had never been in apartment 4F. Arce and Mendez stated further that it would have been impossible for the informant to observe Molina entering their apartments, 2J and 2F, respectively, by key during the New Year's party as described in the Boylan affidavit and declarations. Both couples had been at home at the time in question; and no one other than the couples themselves had keys to their respective apartments.
 
 
 26
 Challenging other aspects of the Boylan affidavit, plaintiffs' attorneys submitted affidavits reporting their conversations with federal and state prosecutors with respect to prosecutions resulting from prior information received by Boylan from the confidential informant. Plaintiffs' attorney Peter J. Neufield stated that Assistant United States Attorney ("AUSA") Edward T. Ferguson III told Neufield that he had no indication that any of the individuals named in Boylan's affidavit had been arrested after one of the October 1986 raids described in the Boylan search warrant affidavit but that two other individuals had been arrested; Ferguson suggested that Neufield speak to the Bronx County District Attorney's office for further information. Plaintiffs' attorneys stated that they had queried several prosecutors in the Bronx District Attorney's Office who reported that they had found no reference to any court proceedings arising out of the October 1986 seizures described in the Boylan affidavit.
 
 
 27
 In support of their contention that selection of their apartments for search was the product of ethnic discrimination, plaintiffs pointed out that none of them was from the Dominican Republic, and they argued that Boylan had merely targeted any name that sounded Hispanic. The affidavit of their attorney John D.B. Lewis stated that though 143 Bruce is a racially integrated building,
 
 
 28
 it appears that the only residents of 143 Bruce Avenue raided by NYDETF agents on January 8, 1987, were those with Hispanic surnames. In fact, it may be that every Hispanic-surnamed resident of 143 Bruce Avenue was raided by NYDETF on January 8, 1987.
 
 
 29
 (Emphasis in original.) Arce stated in her affidavit that apartment 2A, owned by the Arces, was rented to a Puerto Rican family; the door to 2A was broken in during the raids. In addition, plaintiffs construed the searching officers' comments to Mendez about roaches and to Arce about being able to afford to purchase two apartments as ethnic slurs. Plaintiffs urged that they be allowed discovery to obtain substantiation for their view of the ethnic selectivity of the searches.
 
 C. The Decision of the District Court
 
 30
 In an Opinion and Order dated January 11, 1990, reported at 728 F.Supp. 250, the district court granted partial summary judgment, dismissing all claims except the Fourth Amendment claims of Rivera and Santana for the seizure of their documents. The court found the search warrants facially valid. It found that the Boylan affidavit as submitted included sufficiently fresh facts, along with sufficient information to permit assessment of the informant's knowledge and credibility, to provide the magistrate with a substantial basis for concluding that there was probable cause. In light of the information submitted, the court ruled that the anticipatory nature of the warrants did not invalidate them.
 
 
 31
 The court found that the Boylan affidavit was not materially incomplete, opining that inclusion of the additional information in Boylan's possession would only have strengthened it. The court ruled that plaintiffs had failed to make a sufficient showing under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to warrant an evidentiary hearing since they had not shown on Boylan's part an intent to mislead or a reckless disregard for the truth.
 
 
 32
 The court found the searches themselves, and the officers' conduct during them, objectively reasonable. It found that "[t]he body search of Rivera was conducted without physical contact, in a minimally intrusive manner," and it concluded that the officers' conduct during the execution of the search warrants, though perhaps "threatening and aggressive, ... was not unreasonable under the circumstances." Construing plaintiffs' contentions that defendants had failed to give any warning before breaking into apartments as a claim for damages under the "knock and announce" statute, 18 U.S.C. Sec. 3109 (1988), the court dismissed the claim on the ground that that statute does not authorize a private right of action.
 
 
 33
 The court dismissed the equal protection and Secs. 1981 and 1982 claims for failure to state a claim on the ground that plaintiffs' allegations and proffers did not demonstrate a basis for inferring ethnic motivation for the selection of their apartments or for the conduct of the officers. It dismissed the common-law tort claims on the ground that the individual officers were absolutely immune under the provisions of the FTCA because all of their actions were within the scope of their employment. It found the handcuffing of Rivera and Santana and the strip search of Rivera within the scope of the officers' duties because they were "carried out in a professional manner, and at a point when they seemed appropriate security measures."
 
 
 34
 The only claims that the court did not summarily dismiss were the Fourth Amendment claims of Rivera and Santana for the seizure of their personal documents. The parties subsequently stipulated to the dismissal of these claims with prejudice. Thereafter, a final judgment was entered, dismissing the complaint in its entirety.
 
 
 35
 This appeal followed.
 
 II. DISCUSSION
 
 36
 On appeal, plaintiffs pursue their claims under the Fourth Amendment, their claims of ethnic discrimination, and their common-law tort claims under the FTCA. For the reasons below, we conclude that the dismissal of the Fourth Amendment claims against the individual defendants other than Velez was erroneous to the extent that those claims rest on the execution of the search warrants, and that the court should not have dismissed the common-law tort claims against the United States. In all other respects, we affirm.
 
 A. The Fourth Amendment Claims
 
 37
 Plaintiffs' Fourth Amendment claims may be divided into two general categories: (1) challenges to the probable-cause determination and to the affidavit submitted in support of that determination, and (2) challenges to the manner of execution of the warrants. We reject the former group of challenges but believe that a trial is required as to the latter.
 
 
 38
 1. The Challenges to the Validity of the Warrants
 
 
 39
 Plaintiffs challenge the validity of the warrants principally on the grounds (a) that the information that a cocaine delivery would be received at 143 Bruce on January 8, 1987, was too stale to support a finding of probable cause; (b) that probable cause was in any event lacking for the issuance of an anticipatory warrant; and (c) that the Boylan affidavit contained false or recklessly inaccurate information and omitted information upon which the magistrate would have concluded that there was not probable cause. We reject these arguments.
 
 
 40
 A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden. "[W]here [the] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.... [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). In particular, where the officer requesting the search warrant relies on an informant, the magistrate's role is to examine the totality of the circumstances and to
 
 
 41
 make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.
 
 
 42
 Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); see United States v. Feliz-Cordero, 859 F.2d 250, 252-53 (2d Cir.1988).
 
 
 43
 In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, i.e., true at the time of the application, or whether instead it has become stale.
 
 
 44
 [T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law. Where the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant.
 
 
 45
 United States v. Martino, 664 F.2d 860, 867 (2d Cir.1981), cert. denied, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). In investigations of ongoing narcotics operations, we have held that intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale. See, e.g., id. (22 days); United States v. Fama, 758 F.2d 834, 838 (2d Cir.1985) (5 weeks); United States v. Rowell, 903 F.2d 899, 903 (2d Cir.1990) (18 months).
 
 
 46
 Plaintiffs complain that because the Boylan affidavit did not state when the informant himself learned of the planned delivery, stating only that Boylan had received the information from the informant "[i]n the past week," the information might have been quite stale. Given the affidavit's tenor, suggesting an ongoing flow of information from the informant to Boylan, it was within the province of the magistrate to give this statement a commonsense interpretation as meaning that the informant had passed this information to Boylan shortly after receiving it. The magistrate could have inferred that the information was a week old. Any doubts the magistrate may have had as to the recency of the information could have been resolved by inquiry of Boylan, who swore to his affidavit before the magistrate. Further inquiry by the magistrate would have revealed that the information was just under two weeks old. This interval, in light of (a) the continuing nature of the activity and the observations, and (b) our precedents upholding reliance on information 22 days to 18 months old, plainly was not in itself sufficiently long to make the information stale.
 
 
 47
 Plaintiffs' staleness argument combined with their challenge to the warrants on the ground that they were anticipatory gives us somewhat more pause, though we ultimately reject it. "An anticipatory warrant ... is a warrant that has been issued before the necessary events have occurred which will allow a constitutional search of the premises." United States v. Garcia, 882 F.2d 699, 702 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). We accepted the validity of such warrants in Garcia in the context of a planned controlled delivery of contraband, see also United States v. Wylie, 919 F.2d 969, 974-75 (5th Cir.1990); United States v. Dornhofer, 859 F.2d 1195, 1198 (4th Cir.1988), cert. denied, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989); United States v. Washington, 852 F.2d 803, 804 (4th Cir.), cert. denied, 488 U.S. 974, 109 S.Ct. 512, 102 L.Ed.2d 547 (1988); United States v. Hale, 784 F.2d 1465, 1468 (9th Cir.), cert. denied, 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986), noting that "the fact that the contraband is not 'presently located at the place described in the warrant' is immaterial, so long as 'there is probable cause to believe that it will be there when the search warrant is executed.' " United States v. Garcia, 882 F.2d at 702 (quoting United States v. Lowe, 575 F.2d 1193, 1194 (6th Cir.), cert. denied, 439 U.S. 869, 99 S.Ct. 198, 58 L.Ed.2d 180 (1978)). Such a warrant may be issued if the affidavit submitted in support of the warrant application specifies "how [the agent] has obtained [his] belief [that the anticipated narcotics delivery is to occur, and] how reliable his sources are" so that a judicial officer may have a substantial basis for concluding that "the delivery will occur, and ... there is probable cause to believe that the contraband will be located on the premises when the search takes place." Id. at 703 (emphasis in original).
 
 
 48
 The principal difference between Garcia and the present case is that in Garcia the government planned to make a controlled delivery of narcotics; thus, the fruition of the expectation of the arrival of narcotics on the targeted premises was somewhat within the control of the government. Here, in contrast, the expectation was based on information given to the informant as to a delivery expected in the ordinary course of the drug organization's operations. When the anticipatory warrant is not based on a delivery controlled by the government, there is a greater possibility that the expected drugs will not in fact arrive. In such circumstances, the magistrate should require a particularized showing of strong reason to believe the contraband will in fact be on the targeted premises at the time the warrant is executed. The present case is a close one, and we would have preferred that the record reflect an inquiry by the magistrate focused closely on the likelihood that the expected delivery of cocaine would arrive at 143 Bruce on or before January 7. However, the affidavit showed plainly that the informant was trusted by the coconspirators; for the last several weeks he had been welcomed as a frequent visitor to Molina's apartment, permitted to observe cocaine, to witness repeated sales of large quantities of cocaine, to watch the comings and goings of various coconspirators between apartments, and to be informed directly as to which apartments the narcotics operation controlled. The repeated cocaine sales, revealing a continuity of operation, the informant's continuing access to the premises to make the reported observations, and the permissible inference that Boylan had postponed his application as long as possible in order to be informed of any late change in the anticipated delivery date, allowed the magistrate to conclude that the information was sufficiently fresh notwithstanding the two-week interval. Accordingly, despite the fact that it would have been a prudent exercise of the magistrate's discretion to attempt to elicit from Boylan reason to believe that the December 25 expectation that a large shipment of cocaine would arrive at 143 Bruce on January 7 remained viable, we conclude that in light of all the circumstances discussed above, together with the past seizures of large quantities of cocaine resulting from the informant's information, we cannot say, giving the required deference to the magistrate's determination, that the warrant was invalid because it was anticipatory.
 
 
 49
 Finally, we uphold the summary dismissal of plaintiffs' Fourth Amendment claims insofar as they rest on the contention that the Boylan affidavit intentionally or recklessly made false statements or omitted material information. In the context of a criminal case, where a magistrate has found that an affidavit presented to him showed that there was probable cause for the issuance of a warrant, a challenge to the veracity of the affidavit merits a hearing only if the challenger makes a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and if the allegedly false statement was "necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); see United States v. Orozco-Prada, 732 F.2d 1076, 1089 (2d Cir.), cert. denied, 469 U.S. 845, 105 S.Ct. 154, 155, 83 L.Ed.2d 92 (1984); United States v. Barnes, 604 F.2d 121, 151-53 (2d Cir.1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Intentional or reckless omissions of material information, like false statements, may serve as the basis for a Franks challenge. See United States v. Campino, 890 F.2d 588, 592 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1787, 108 L.Ed.2d 788 (1990). Recklessness may be inferred where the omitted information was "clearly critical" to the probable cause determination. See DeLoach v. Bevers, 922 F.2d 618, 622 (10th Cir.1990); Hale v. Fish, 899 F.2d 390, 400 (5th Cir.1990); United States v. Reivich, 793 F.2d 957, 961 (8th Cir.1986). The Franks standard, established with respect to suppression hearings in criminal proceedings, also defines the scope of qualified immunity in civil rights actions. See Magnotti v. Kuntz, 918 F.2d 364, 367-68 (2d Cir.1990). An officer can "have no reasonable grounds for believing that [a] warrant was properly issued" "[i]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984). Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, the shield of qualified immunity is lost. See Malley v. Briggs, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1097-98, 89 L.Ed.2d 271 (1986).
 
 
 50
 Plaintiffs' principal quarrels with the Boylan affidavit are (a) that it did not provide all of the information Boylan possessed with respect to the confidential informant, such as the exact dates of his conversations with Molina; (b) that it masked the fact that all of the informant's information had come from Molina rather than from different members of the Dominican organization; (c) that Boylan somehow misused the information obtained from Con Edison; and (d) that the affidavit's statement that there had been arrests and prosecutions as a result of the informant's prior communications may have been false. The Franks standard is a high one, and we agree with the district court that plaintiffs have not succeeded in meeting it here.
 
 
 51
 We see no problem with the Boylan affidavit's failure to identify the informant, to give the dates of his communications with Molina, to state that information was obtained at a Christmas or New Years' party, or to specify that all of the informant's communications were with Molina. So long as law enforcement agents present adequate information to permit the magistrate to conclude that there is probable cause and do not suppress facts that would cast doubt on its existence, they may properly exclude information that would unduly risk revealing a confidential informant's identity and exposing him or her to harm. See, e.g., United States v. Strini, 658 F.2d 593, 597 (8th Cir.1981) (failure to reveal informant's identity is not a false statement within the contemplation of Franks when the omission was intended not to enhance the contents of the affidavit but to protect the informant).
 
 
 52
 Nor did plaintiffs make any showing of misuse of Con Edison as a source of information. Though plaintiffs seem to criticize, first, any investigation of the utilities records, we find it difficult to fault an agent's attempt to obtain information. Further, while plaintiffs would have us infer that the Boylan affidavit used the negative results of the Con Edison inquiry to bolster the showing of probable cause, the affidavit, read in a commonsense fashion, seems to suggest rather that hoped-for corroboration had not been forthcoming, but that the lack of corroboration was not a negative factor and was merely neutral. Finally, though plaintiffs suggest that additional checking by Boylan would have revealed that none of the plaintiffs was Dominican and that Rivera, the Arces, and the Mendezes had lived at 143 Bruce for some time, those facts would hardly have eliminated probable cause in light of the information that Molina had pointed out or entered these specific apartments in connection with the Dominican organization's drug operations.
 
 
 53
 Finally, plaintiffs' effort to show that the Boylan affidavit misrepresented the results of prior information received from the informant was insufficient. Plaintiffs' attorneys submitted affidavits stating that they had been informed by state prosecutors in the Bronx that the latter had seen no record of "court proceedings" arising out of the October 1986 events and that AUSA Ferguson advised plaintiffs he had no indication that any of the persons named in Boylan's affidavit had been arrested or charged in the Bronx cases. There are several problems with plaintiffs' proffer. First, the representations as to what the attorneys were told by the Bronx prosecutors are hearsay and thus are not entitled to weight. See, e.g., Wyler v. United States, 725 F.2d 156, 160 (2d Cir.1983). Second, in the absence of more detailed statements, it is impossible to know whether the prosecutors' search was adequate to find records of court proceedings arising out of the October 1986 events; hence their not finding such records may not have been relevant. Third, there was no showing that the absence of an indication that any of the persons named in Boylan's affidavit had been arrested or charged was material, since the Boylan affidavit did not purport to state that the individuals it named were the individuals arrested. Ferguson advised plaintiffs' attorneys and the court of other persons who were arrested. Finally, even if there were no records of court proceedings against anyone, plaintiffs have not managed to cast doubt on the Boylan affidavit's representations that a significant quantity of narcotics was seized and that arrests occurred. Given the lack of any serious challenge to these facts, we could not conclude that the absence of court proceedings would have materially affected the magistrate's determination that there existed probable cause.
 
 
 54
 In sum, we find no error in the district court's rulings that summary judgment was warranted dismissing so much of plaintiffs' Fourth Amendment claims as were premised on flaws in the warrants or the underlying affidavit.
 
 2. Execution of the Search Warrants
 
 55
 We reach a different conclusion to the extent that plaintiffs' Fourth Amendment claims are grounded on allegations of improper execution of the search warrants. The bases for these claims include the assertions that the agents battered plaintiffs' doors without first knocking or identifying themselves, that the searches were not merely thorough but were unreasonably destructive, and that the treatment of Rivera, with one officer forcing her head to the floor with his foot and others subsequently performing a publicly observable strip search, was excessively intrusive. These claims raised questions of fact.
 
 
 56
 We reject defendants' contention that we should uphold the summary dismissal of claims based on the agents' failure to knock and identify themselves on the grounds that plaintiffs merely failed to hear knocks and identifications that actually occurred, or that exigent circumstances justified any failure to provide notice. The Fourth Amendment required the officers to make a reasonable effort to provide actual, and not merely pro forma, notice of their identity and imminent entry. See United States v. Mapp, 476 F.2d 67, 75 (2d Cir.1973) (notice of purpose and identity required by both Sec. 3109 and Fourth Amendment); Miller v. United States, 357 U.S. 301, 311, 78 S.Ct. 1190, 1196, 2 L.Ed.2d 1332 (1958) (responding to request for identification by saying "police" in a low voice that might not have been heard is not sufficient notice for purposes of 18 U.S.C. Sec. 3109); see also United States v. Andrus, 775 F.2d 825, 844 (7th Cir.1985) (applying Sec. 3109 notice requirement in Fourth Amendment context); United States v. Francis, 646 F.2d 251, 257-58 (6th Cir.), cert. denied, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981) (same); United States v. Baker, 638 F.2d 198, 202-03 & n. 7 (10th Cir.1980) (same); but see United States v. Nolan, 718 F.2d 589, 600-02 (3d Cir.1983) (opining that prohibitions of Fourth Amendment and Sec. 3109, though overlapping, do not perfectly coincide). Further, exigent circumstances may excuse noncompliance with the notice requirement for executing search warrants only where (1) the officers believe there is an imminent danger of bodily harm to persons inside or of destruction of critical evidence and (2) their belief is objectively reasonable. See United States v. Spinelli, 848 F.2d 26, 29 (2d Cir.1988); United States v. Stewart, 867 F.2d 581, 584 (10th Cir.1989).
 
 
 57
 Whether defendants made any effort whatever to announce themselves is in sharp dispute. The resolution of that dispute is a matter for the finder of fact, not for the court on summary judgment. Similarly, a determination of whether exigent circumstances made it justifiable for the agents to enter, or reasonably to believe they had a right to enter, without announcing themselves is "fact-specific." See Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); United States v. MacDonald, 916 F.2d 766, 769 (2d Cir.1990) (en banc), cert. denied, --- U.S. ----, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). On a motion for summary judgment, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 58
 There are similar questions as to the conduct of the searches. Absent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion. See Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). They also have the authority to make a limited search of an individual on those premises as a self-protective measure. See, e.g., United States v. Barlin, 686 F.2d 81, 87 (2d Cir.1982) (search of handbag of woman who had entered an apartment together with individuals known to be involved in drug transactions in the apartment constituted a reasonable, self-protective "minimal intrusion"). Beyond this general authority to detain persons and make limited security searches, however, there must be probable cause, or at least some degree of particularized suspicion, to justify further searches or seizures of individuals who are neither named in the warrant nor arrested as a consequence of the search. See generally Ybarra v. Illinois, 444 U.S. 85, 91-94, 100 S.Ct. 338, 342-43, 62 L.Ed.2d 238 (1979). Mere possession of a search warrant, for example, will not normally authorize strip searches of the occupants of the premises. See generally Burns v. Loranger, 907 F.2d 233 (1st Cir.1990). A strip search is by its very nature a "highly intrusive invasion." M.M. v. Anker, 607 F.2d 588, 589 (2d Cir.1979); see Walsh v. Franco, 849 F.2d 66, 69-70 (2d Cir.1988); Burns v. Loranger, 907 F.2d at 235 n. 6 ("there can be no question that a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual"). Even misdemeanor arrestees have a right, absent a particularized suspicion that "the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest," not to be subjected to strip searches by prison officials. Weber v. Dell, 804 F.2d 796, 802 (2d Cir.1986), cert. denied, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).
 
 
 59
 In the present case, Boylan's investigation of the persons residing in the targeted apartments had not revealed any indication that those persons had ever been involved in wrongdoing. There are substantial questions here as to whether the circumstances warranted any belief on the part of the officers that a pat-down search would not suffice to reveal the concealment of any weapons, and whether it would have been reasonable for the officers to think that at 6 a.m. an occupant of the apartment would be concealing contraband on her person or under her undergarments.
 
 
 60
 In sum, though it was undoubtedly reasonable as a matter of law for the agents to frisk the occupants of the apartments and to prevent them, prior to completion of the searches, from making telephone calls that could prematurely alert coconspirators, the claims that no notice of entry was given, that property was unreasonably destroyed, and that physical treatment was excessively rough or intrusive, raised questions of fact. Any question as to whether, if plaintiffs' Fourth Amendment rights were violated, the individual defendants have qualified immunity because they had a reasonable belief that, under the circumstances, their actions did not violate those rights, also rests on disputed questions of fact. See Anderson v. Creighton, 483 U.S. at 642-46, 107 S.Ct. at 3040-42. We conclude that the district court erred in ruling that the treatment of the occupants and their property during the execution of the warrants was reasonable as a matter of law and in dismissing these claims on summary judgment.
 
 B. The Claims of Ethnic Discrimination
 
 61
 Section 1981 provides, in pertinent part, that all persons "shall have ... the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. Sec. 1981. Section 1982 provides that "[a]ll citizens of the United States shall have the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property." Id. Sec. 1982. Section 1982 applies to "official action of t[he] kind that would prevent [non-whites] from exercising the same property rights as whites ...[,] that depreciated the value of property owned by [non-white] citizens ...[, or] hampered [non-whites] in the use of their property." Memphis v. Greene, 451 U.S. 100, 123, 101 S.Ct. 1584, 1598, 67 L.Ed.2d 769 (1981). Both Secs. 1981 and 1982 and equal protection concepts protect against discrimination on the basis not only of race, but also of "ancestry or ethnic characteristics." Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987) (Sec. 1981); see also Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir.1987) (same); Hernandez v. Texas, 347 U.S. 475, 477-79, 74 S.Ct. 667, 669-71, 98 L.Ed. 866 (1954) (equal protection); Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987) (Sec. 1982).
 
 
 62
 Assuming that these provisions forbid selection of search targets on the basis of the ethnicity of their owners, see, e.g., Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969) (Sec. 1982 should not be given unduly narrow construction in light of "the broad and sweeping nature of the protection meant to be afforded by Sec. 1 of the Civil Rights Act of 1866 ... from which Sec. 1982 was derived"); Mahone v. Waddle, 564 F.2d 1018, 1027-30 (3d Cir.1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978) (Sec. 1981 prohibits racially-motivated seizures and searches), we nonetheless conclude that the district court properly summarily dismissed plaintiffs' claims that the searches of their homes were the product of racial or ethnic discrimination. These claims require proof of intentional discrimination, see Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Equal Protection Clause); General Building Contractors Association v. Pennsylvania, 458 U.S. 375, 382-91, 102 S.Ct. 3141, 3145-50, 73 L.Ed.2d 835 (1982) (Sec. 1981); Phillips v. Hunter Trails Community Association, 685 F.2d 184, 187-89 (7th Cir.1982) (Sec. 1982), and plaintiffs did not come forward with sufficient facts from which ethnic animus might be inferred.
 
 
 63
 Plaintiffs contend that their claim of ethnic discrimination is supported by the fact that the only targets of the searches at 143 Bruce, an integrated building, were persons with Hispanic surnames, and they assert in this Court that every Hispanic-surnamed resident was so targeted. They did not, however, submit support for the latter proposition. The affidavit of their attorney stated only that it "may be" that every Hispanic-surnamed resident of the building was so targeted. To avoid summary judgment, it was incumbent on plaintiffs to come forward with more than merely the speculation of their attorney. The fact that plaintiffs' discovery requests were stayed with respect to government witnesses does not excuse this failure, for the stay did not prevent them from pursuing information through informal routes or from persons other than the defendants. Information as to the building's demographics was hardly exclusively in the possession of the law enforcement agents. For example, plaintiffs noted that their own names appeared on their mailboxes in the building's lobby; they could have examined the other mailboxes and informed the court, if it were true, that no other Hispanic-sounding names appeared. As it stands, however, the record contains no factual support for plaintiffs' contention.
 
 
 64
 Plaintiffs' allegations of ethnic slurs during the searches were also insufficient to fend off summary judgment. Even acknowledging the sincerity of Arce's and the Mendezes' subjective responses to the officers' queries about financial resources and roaches, these questions, either standing alone or in the context of the record as a whole, did not provide evidence of ethnic animus on the part of the officers.
 
 C. The Common-Law Tort Claims
 
 65
 The district court dismissed plaintiffs' common-law tort claims on the ground that the FTCA gave the individual defendants absolute immunity from a suit for damages because those defendants were acting within the scope of their employment. Though we affirm this dismissal with respect to the individual defendants, we reinstate those claims against the United States.
 
 
 66
 Section 2679(b)(1) of the FTCA, as amended in 1988 and to the extent pertinent here, provides that a suit against the United States is the exclusive remedy for a suit for damages for injury or loss of property "resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. Sec. 2679(b)(1). This provision does not apply to suits for violation of federal constitutional or statutory rights, see id. Sec. 2679(b)(2), but provides government employees with immunity against claims of common-law tort.
 
 
 67
 The question of whether the act was wrongful is a different one from whether the act occurred while the employee was acting within the scope of his employment. Here it is clear that the individual defendants were law enforcement officers and that their jobs included the investigation of narcotics trafficking and the execution of federal search warrants. Plainly, therefore, whether or not in the course of so doing they performed wrongful acts, such as entering unannounced to execute the warrants or using excessively intrusive means of executing the warrants, the execution of the warrants was nonetheless within the scope of their employment. Accordingly, under Sec. 2679, the individual defendants are immune from suit on plaintiffs' claims of common-law tort.
 
 
 68
 Section 2679 does not, however, deprive plaintiffs of a remedy; it merely makes suit against the United States the exclusive remedy. Under Sec. 2674, the United States is liable for such tort claims "in the same manner and to the same extent as a private individual under like circumstances" would be, 28 U.S.C. Sec. 2674; and where, as here, the claim focuses on actions of employees of the executive branch of the government, the United States does not have the advantage of any defense of official immunity that the employee might have had, see id.
 
 
 69
 The district court, which had found virtually all of the individual defendants' actions reasonable, dismissed even plaintiffs' claims against the United States. In light of our ruling that there are questions of fact as to the reasonableness of the conduct of the defendants during the execution of the search warrants, plaintiffs must be allowed to pursue their common-law tort claims against the United States.
 
 D. Other Matters
 
 70
 Defendant Velez submitted evidence in the district court showing that he had not participated in the procurement or execution of the warrants on the apartments at 143 Bruce. Thereafter, plaintiffs conceded that he had not been involved and consented to his dismissal from the action. Accordingly, the dismissal of all claims against Velez is proper.
 
 
 71
 Plaintiffs' complaint also named as a defendant the DEA. The FTCA, however, precludes tort suits against federal agencies. See 28 U.S.C. Sec. 2679(a). The only proper federal institutional defendant in such an action is the United States. Hence, the claims against the DEA are properly dismissed for lack of federal jurisdiction.
 
 CONCLUSION
 
 72
 For the reasons above, we affirm so much of the judgment as (a) dismissed all claims against Velez and the Drug Enforcement Administration, (b) dismissed statutory and constitutional equal protection claims against the remaining defendants, and (c) dismissed the common-law tort claims against the individual defendants. We vacate so much of the judgment as (a) dismissed plaintiffs' Fourth Amendment claims against the individual defendants other than Velez for unlawful execution of the search warrants, and (b) dismissed plaintiffs' common-law tort claims against the United States. We remand for trial of the latter groups of claims.