UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: February 26, 2013          Decided: January 21, 2014)

Docket No. 12-2220-cv

_____

RONITA MCCOLLEY,

*Plaintiff-Counter-Claimant-Counter-Defendant-Appellee*,

v.

COUNTY OF RENSSELAER,

*Defendant-Cross-Claimant-Counter-Claimant-Appellant*,

MICHAEL RILEY, INVESTIGATOR, individually and
as agent, servant and/or employee of the County of Rensselaer,

*Defendant-Appellant*.[*]

_____

Before: CALABRESI, POOLER, and RAGGI, *Circuit Judges*.

---

[*] The Clerk of the Court is directed to amend the caption as set out above.

The County of Rensselaer and Rensselaer County Drug & Gang Task Force Investigator Michael Riley appeal from a judgment of the United States District Court for the Northern District of New York (Lawrence Kahn, *J.*) denying summary judgment on their claim of qualified immunity for purported violations of the Fourth Amendment and state tort law based upon omissions from Riley's application for a search warrant of Ronita McColley's residence. We conclude that disputed material facts underlie the denial of qualified immunity.

Dismissed for lack of jurisdiction. Judge Calabresi concurs in a separate opinion, and Judge Raggi dissents in a separate opinion.

———————————

CRYSTAL R. PECK, Bailey, Kelleher & Johnson, P.C., Albany, NY, *for Appellants*.

GENNARO DOMINICK CALABRESE (Terence L. Kindlon, *on the brief*), Kindlon Shanks & Associates, Albany, NY, *for Appellee*.

POOLER, *Circuit Judge*:

The County of Rensselaer ("Rensselaer") and Rensselaer County Drug & Gang Task Force ("Task Force") Investigator, Michael Riley ("Riley"), appeal from a judgment of the United States District Court for the Northern District of

New York (Lawrence Kahn, *J.*) denying summary judgment on their claims of qualified immunity for purported violations of the Fourth Amendment and state tort law based upon omissions made by Riley in the application for a search warrant of Ronita McColley's home. We conclude that disputed material factual issues underlie the district court's denial of qualified immunity, and thus dismiss the appeal for lack of jurisdiction.

**BACKGROUND**

**I.**

Ronita McColley ("McColley"), a mother with no criminal history or connection to criminality and an employee at the Center for Disability Services in Albany, New York, lived with her young daughter in the first floor apartment of 396 First Street in Troy, New York, since 2003. On July 3, 2008, at approximately 6:00 a.m., McColley was awoken in her home by the sound of the City of Troy Police Department Emergency Response Team ("ERT") knocking down her door and the explosion of a flash-bang grenade. Dressed in all black, wearing face masks, and carrying automatic weapons, the members of the ERT screamed for McColley to get on the floor, but as there was not enough space for her to lie on the floor, a member of the ERT instead shoved McColley face down onto her bed.

3

As she had been roused from sleep, McColley was clad in only a t-shirt and underwear. She repeatedly requested to cover herself but was repeatedly denied. These events took place under the authorization of a no-knock search warrant secured by Riley on June 27, 2008.

In connection with a drug investigation in Troy, Riley submitted a search warrant application to obtain four warrants to search four residences within the city, including McColley's home. The application was based upon information received from a confidential informant ("CI"). On June 23, 2008, this CI, who had performed four controlled buys for the Rensselaer County Drug and Gang Task Force in the past, contacted Riley, advising him that he could purchase crack-cocaine from an individual identified as "Sport." Riley and other members of the Task Force set up a controlled buy, whereby the CI purchased crack-cocaine. On June 25, 2008, the CI again contacted Riley. He told Riley that, on the previous day, he had been taken to the first floor apartment of 396 First Street— McColley's home—to purchase crack from Sport. The CI further indicated that a drug dealer he had known for years, "Stink," was also present at 396 First Street and used a King of Hearts playing card to remove cocaine from a scale. The CI also noted there was a third male that he did not know in the

4

apartment. The initial report from the CI and the related affidavit by Riley made no mention of a woman being present in the apartment. Though the CI indicated that he purchased drugs at 396 First Street on the singular occasion he had visited, the Task Force identified the apartment as a "stash house."

In addition to the information surrounding 396 First Street, the CI told Riley about three locations in Troy that were maintained by Stink and Sport—each of their two residences and an apartment leased to Tanisha Bruce, who reportedly sold "approximately one hundred grams of marijuana per week" provided by Stink. The CI informed Riley that he had visited Bruce's apartment over twenty times throughout the course of the previous six months with Stink and that Stink had made drug deals on each occasion. Upon Riley asking the CI whether Stink had "custody and control" of the apartment at 396 First Street, the CI responded, "Yes." The CI apparently did not describe the facts from which he was able to come to this conclusion based on only one visit to 396 First Street, merely indicating that as to 396 First Street, Bruce's apartment, and Stink's own apartment, Stink "comes and goes as he pleases."

On the same day, Riley conducted drive-bys of each of the four locations in order to have the CI identify them. After the CI had identified 396 First Street,

5

Riley and his supervisor, Investigator Arthur Hyde, directed undercover officers in both stationary and drive-by surveillance on the apartment. No narcotics or other criminal activity was witnessed during the surveillance. Because the residences were located in a high crime area, the stationary surveillance was not conducted for extended periods of time. Following the identification of 396 First Street and prior to his application for a search warrant, utilizing a Lexis Nexis search and then running a criminal background check, Riley determined that McColley was the resident at that address, that she had no criminal history, and that she had a young child.

On June 27, 2008, Riley submitted an application for a search warrant for 396 First Street to Judge Turner of the City of Troy Criminal Court. The same affidavit was offered in support of search warrants for each of the locations identified by the CI. Riley identified the information provided by the CI as the basis for the application. Riley stated that the CI had previously given information that proved to be "both accurate and reliable" and which "led to five previous drug purchases and two search warrants, which resulted in the seizure

of illegal drugs and contraband."[1]  The warrant application recounted the CI's

description of his interaction with Stink and Sport in the apartment.  The affidavit

also recounted the details relating to Bruce's apartment, including that the CI had

visited the apartment between twenty and thirty times over the preceding six-

month period and that Stink or Sport made drug deals on each occasion.  For

each of the search locations with the exception of McColley's home, Riley

identified the resident individual and described his or her ties to drug dealing

and criminality.  Riley never mentioned McColley's identity, lack of criminal

history, or even the fact that there was a resident who lived at 396 First Street—as

opposed to the apartment being a location exclusively used by Stink in his drug

dealing enterprise.  In the warrant application, Riley also made no mention of the

fact that surveillance had been conducted and yielded no evidence or even

suspicion of narcotics or other criminal activity.

The search of McColley's home did not uncover any money, weapons,

drugs, drug-related paraphernalia, or any evidence of criminality of any kind.

---

[1] The CI had actually only made four previous controlled buys for the Task Force.
McColley points to this discrepancy as undermining that validity of the warrant, but, as the
district court concluded, this was not a material error.

The ERT took only a National Grid electric and gas bill and a registration bill for Hudson Valley Community College as fruits of the search.

## II

After McColley filed the instant action, Defendants moved for summary judgment on all counts. The district court granted summary judgment in part and denied it in part. The court denied summary judgment to Riley on McColley's Fourth Amendment claim, determining that material questions of fact prevented a finding of qualified immunity. The district court also denied summary judgment on McColley's related state tort claims as the viability of those claims rested on the determination as to probable cause, which the court already determined was subject to material questions of fact. Rensselaer and Riley now appeal the denial of the claim of qualified immunity.

## DISCUSSION

## I.

"Ordinarily, orders denying summary judgment do not qualify as 'final decisions' subject to appeal." *Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011). There exists a "limited exception to the categorization of summary judgment denials as nonappealable orders," *id.*, for a "denial of a claim of qualified immunity, to the

8

extent that it turns on an issue of law," *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This Court may "exercise interlocutory jurisdiction if the defendant contests the existence of a dispute or the materiality thereof, or . . . contends that he is entitled to qualified immunity even under plaintiff's version of the facts." *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998). Such a denial of qualified immunity is reviewed by this Court to determine whether "the qualified immunity defense may be established as a matter of law." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). This "review extends to whether a given factual dispute is 'material' for summary judgment purposes, . . . not . . . whether a dispute of fact identified by the district court is 'genuine.'" *Id.*

The district court determined that there were genuine issues of material fact that prevented a finding of qualified immunity with respect to Riley's submission of the warrant application. Because the district court determined that Riley made material omissions from the search warrant affidavit such that there was an issue of fact as to whether there was probable cause for the warrant to issue, it also found the same with respect to qualified immunity. While appellate courts cannot generally review denials of summary judgment,

9

an interlocutory appeal is available "to challenge the trial judge's rejection of the immunity defense where the defendant contends that on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law because . . . it was objectively reasonable for him to believe that his action did not violate clearly established law."

*Tierney*, 133 F.3d at 194 (quoting *Salim v. Proulx*, 93 F.3d 86, 90-91 (2d Cir. 1996)).

Jurisdiction may exist "where the lower court rules that material disputes of fact preclude summary judgment on qualified immunity," when a defendant contests the materiality of the disputed facts or argues "he is entitled to qualified immunity even under the plaintiff's version of the facts." *Id.*

In the instant case, Appellants contend that, accepting McColley's version of the facts, Riley is entitled to qualified immunity because the omissions he made from the search warrant application did not alter the probable cause analysis as a matter of law. In order to determine whether this Court has jurisdiction, we must look to whether, as a matter of law, Riley's actions—as viewed through the facts taken in a light most favorable to McColley—amount to a constitutional violation. If there is a question as to whether under these facts, Riley's omissions amounted to a constitutional violation, then this Court does not

have jurisdiction because the denial of qualified immunity rested upon factual issues.

## II.

A plaintiff can demonstrate that her right not to be searched absent a search warrant supported by probable cause "was violated where the officer submitting the probable cause affidavit 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.'" *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). Recklessness is inferred when the omitted information was "clearly critical" to the determination of probable cause. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (internal quotation marks omitted). "The materiality of a misrepresentation or an omission in this context is a mixed question of law and fact. The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law. But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful

11

cases." *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994) (citations omitted). In determining whether omitted information was necessary to the finding of probable cause, "we look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." *Escalera*, 361 F.3d at 743-44. In performing the "corrected affidavit" analysis, "we examine all of the information the officers possessed when they applied for the arrest warrant." *Id.* at 744 (citing *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997)). While "the law does not demand that an officer applying for a warrant 'volunteer every fact that arguably cuts against the existence of probable cause,'" he must "'not omit circumstances that are critical' to its evaluation." *Walczyk v. Rio*, 496 F.3d 139, 161 (2d Cir. 2007).

When making a determination of whether probable cause exists to support the issuance of a search warrant when the facts offered are based upon information from a confidential informant, this Court examines the "totality of the circumstances." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (internal quotation marks omitted). "In performing this examination of the

12

'totality of the circumstances' . . . the court may consider . . . 'an informant's veracity, reliability and basis of knowledge,' and the extent to which an informant's statements . . . are independently corroborated." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (internal citations omitted). These considerations, however, are not an exhaustive listing of what constitutes the "*totality* of the circumstances." *Smith*, 9 F.3d at 1012 (emphasis added).

## III.

The district court determined that two material omissions from the warrant application—the identity of McColley as the resident of 396 First Street and the fact that both stationary and drive-by surveillance had not led to the observation of any criminal activity— undermined the finding of probable cause. Thus, the court denied qualified immunity with respect to McColley's Fourth Amendment claim against Riley and the state tort claims against Riley and Rensselaer.[2] This

---

[2] McColley argued that Riley made five omissions from the warrant application that were material and thus undermined the finding of probable cause: (1) errors as to the date the CI went to 396 First Street and the date Riley learned about this trip; (2) an assertion that the CI had accurately identified all of the addresses at issue, when in fact he gave the address at Sixth and Glenn instead of 17 101st Street; (3) a claim that the CI had made five controlled buys, when in fact the CI had made four previous controlled buys and one controlled buy in the instant case; (4) omission of the identity and criminal history of McColley; and (5) omission of the fact that surveillance of 396 First Street did not indicate any criminal activity. As to the other purported omissions, the district court determined that reliance on these to disturb the finding of probable cause would be just the sort of "hypertechnical" reading of the warrant that has been cautioned against. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965). We do not disturb that analysis here.

Court thus considers a "corrected affidavit" that would include these omitted facts in analyzing whether there was probable cause for the warrant to issue. *Escalera*, 361 F.3d at 743-44.

We begin by noting that where a warrant affidavit is based upon information provided by a confidential informant, any omissions become all the more glaring because any material omission necessarily alters the "totality of the circumstances" upon which the confidential information is to be assessed. Each omitted fact necessarily alters this totality because such review demands that courts consider the whole picture and not just the particular facts favored by the officer applying for the warrant. In the face of information that is provided by a confidential informant, each individual fact that composes the totality of the circumstances is all the more likely to be "critical" to the evaluation of probable cause. *Walczyk*, 496 F.3d at 161.

While it is indeed the case that where a warrant "does not report a prior conviction for a particular crime, the magistrate assumes for purposes of determining whether the government has carried its burden that no such conviction exists," *Walczyk*, 496 F.3d at 161, the pertinent omission here was not merely McColley's lack of criminal history. Rather, McColley herself was

14

omitted entirely from the application. The issuing judge did not have the benefit of assuming that "no such conviction exist[ed]" because he was not informed that anyone other than Stink, who was the identified target of the drug investigation, resided in or maintained the first floor apartment at 396 First Street. Riley, on the other hand, fully knew that McColley, an individual with no criminal history and no purported ties to the targets of the drug investigation, lived there with her child. Especially in the face of Riley's inclusion of the identity of the residents for each of the other apartments and their present connection to the drug trade, the omission of McColley's existence is all the more glaring. As drafted by Riley, with no mention of McColley, the warrant application makes it appear to the issuing magistrate that Stink was the only individual with custody and control of 396 First Street. If the residents of 396 First Street were properly identified, a reasonable issuing judge would have questioned the assertion that Stink had "custody and control" over the apartment. Unlike Bruce's apartment, there was no similar claim of repeated visits at 396 First Street from which knowledge of such custody could have been inferred. Including McColley's identity in the affidavit and attendant lack of connection to Stink, Sport, Bruce, and their drug trade—either explicitly or implicitly by not describing any such history or

15

connection—could indeed have altered an issuing magistrate's assessment of the totality of the circumstances with respect to the CI's information about 396 First Street. The exact weight that the judge would have given this information remains a question of fact that prevents this Court from exercising jurisdiction over the district court's denial of summary judgment on the claim of qualified immunity. *Velardi*, 40 F.3d at 574.

The other material omission from the warrant application made by Riley was that the police conducted both stationary and drive-by surveillance on 396 First Street and observed no criminal activity. As courts have recognized that independent corroboration is an aspect of the totality of the circumstances from which the credibility of a confidential informant can be assessed, *Gagnon*, 373 F.3d at 235, so too is information that expressly fails to corroborate a confidential informant's account. While the police may not have been required to corroborate the CI's assertions, once they undertook this surveillance and observed no such criminal activity, this lack of corroboration should have been included in the warrant application. The materiality of this information is underscored by the common-sense observation that if the surveillance had yielded evidence of criminality, that information certainly would have been included in the warrant

16

application and deemed to have been damning.  The mere fact that the outcome

of the surveillance was not the one the police would have preferred does not

render the information immaterial.

The omission of this fact was not a failure to provide unnecessary

corroboration; it was a failure to provide known information that goes directly to

the credibility of the CI.  A confidential informant's credibility is plainly

relevant—even critical—to the probable cause determination, and thus the fact

that surveillance provided no evidence or even suggestion of criminal activity

should have been included in the warrant affidavit.  Just as with the omission of

McColley's identity, the omission of the unsuccessful surveillance altered the

"totality of the circumstances" under which the information provided by the CI

should have been assessed.  And just as with the omission of McColley's identity,

the weight that an issuing magistrate would have given to this information is a

question for the finder of fact.  *Velardi*, 40 F.3d at 574.

The dissent's insistence on the existence of arguable probable cause does

not alter our analysis.  Arguable probable cause, a doctrine imported into this

Circuit's corrected affidavit jurisprudence in *Escalera*, 361 F.3d at 744; *see also*

Opinion of Calabresi, J. **at [7-8]**, exists if "(a) it was objectively reasonable for the

17

officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera*, 361 F.3d at 743 (internal quotation marks omitted). The dissent conflates the questions of facts regarding the CI's credibility with that of whether reasonable officers could disagree as to the existence of probable cause. Questions of fact exist in this case with respect to the reliability of the CI's information regarding 396 First Street. Whether *reasonable* officers would disagree on whether there was probable cause is equally dependent on the questions of fact previously identified. If the CI's information regarding McColley's home was not reliable, then reasonable officers would *not* disagree as to the lack of probable cause. The dissent would have the doctrine of arguable probable cause swallow the entire rule of qualified immunity as well as the related limitation on our jurisdiction. This cannot be.

The information omitted from the warrant application was indeed "necessary to the finding of probable cause" because both McColley's identity and the lack of criminal activity observed at her home go directly to the "totality of circumstances" review that underlies the assessment of probable cause based upon information provided by confidential informants. The Appellants would

18

have this Court conclude that once information has been provided by a

confidential informant who has proven reliable in the past, a warrant is

necessarily supported by probable cause when based upon information from that

confidential informant.  This view misapprehends the "totality of circumstances"

test—in assessing whether there is probable cause based upon a confidential

informant's reports, courts must look to *all* of the circumstances bearing upon the

information's reliability.  *Smith*, 9 F.3d at 1012.

In this case, McColley's identity, the fact that the CI did not report that a

woman was present in the apartment,[3] and the fact that attempts at independent

corroboration via surveillance showed no sign of criminal activity are all

omissions that bear upon the reliability of the overall information provided.

While we share the concerns raised in the concurrence with respect to the

particularly intrusive method of entry used in this case, *see* Opinion of Calabresi,

---

[3] Rensselaer and Riley now assert that the CI did indeed report the presence of a woman at the apartment.  This assertion arose for the first time at Riley's deposition, however, the contemporaneous materials—the two voluntary statements submitted by the CI and the affidavit submitted by Riley to the court issuing the warrant—include no such claim.  It is notable that such a potentially critical fact, one that could have supported a claimed link between McColley and the drug trade, was not proffered until the heat of litigation.  As this Court must consider the facts in the light most favorable to the plaintiff, we do not credit this late assertion.

J. at **[15]**, issues of fact underlie the weight that the issuing judge would have given the omitted information regardless of the method of entry employed. As such, this case lies outside of the jurisdiction of this Court to perform interlocutory review of the denial of summary judgment. The issue of qualified immunity, including the question of reasonableness as to the type of warrant sought and used, is not properly before us at this stage of the proceedings.

## CONCLUSION

For all of the reasons discussed above, the appeal is dismissed for a lack of jurisdiction.

Calabresi, *Circuit Judge*:

Despite the fact that they reach opposite conclusions, my colleagues' opinions both find strong support in our Court's case law. This is because our precedents in this area are as divided as our panel.

Judge Pooler would send this case to a jury, having identified a question of fact: the weight a neutral magistrate would give to evidence omitted from Investigator Michael Riley's warrant affidavit. The existence of such a fact question strips us of jurisdiction over this interlocutory appeal.

Judge Raggi would instead dismiss Plaintiff Ronita McColley's Fourth Amendment claim against Riley. She would do so either because an affidavit, even without the omissions, would still have established probable cause for the search of McColley's home, or, alternatively, because *some* reasonable people might find that such probable cause would have been established. This would, in turn, suffice to give rise to "arguable probable cause," which, she asserts, would result in qualified immunity for Riley. This latter scenario, in which some would and others would not find probable cause on the basis of the corrected affidavit, is, of course, precisely what Judge Pooler describes as a factual dispute about the weight of the omitted evidence. But while Judge Pooler concludes that such a

1

dispute strips us of jurisdiction, Judge Raggi sees it as a basis for granting Riley qualified immunity as a matter of law.

I write separately in part to underscore the divided precedents that give rise to this dispute. I also write, however, because I believe that the particular question to be asked in the case before us is not simply whether the warrant would have been issued, but rather whether the magistrate would have issued the precise *kind* of warrant Riley sought and obtained: namely, a "no-knock" warrant to be executed at any time of the day or night.[1] The question we must ask, in other words, is not just whether the facts known to Riley established probable cause to search for drugs at 396 First Street. The determinative question in the instant case is whether those facts gave rise to a reasonable suspicion that a normal, "knock-and-announce" search of McColley's home would have been dangerous or futile, *see Richards v. Wisconsin*, 520 U.S. 385, 394 (1997), and hence that a no-knock intrusion—which allowed police to throw a stun grenade

---

[1] As I explain in Part II, because of the privacy and property interests implicated in no-knock searches, the Supreme Court has held that they are only justified when the police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

through an apartment window, break down its door, and burst in with automatic weapons drawn—was justified in an apartment where a woman and child with no criminal history lived and where no ongoing criminal activity had been observed.

It may well be the case that, *as a matter of law*, the no-knock warrant Riley sought would not have issued had Riley shared all the relevant information that he knew. I am inclined to think so. But I need not go that far, however, as I conclude that there is, manifestly, at least a question of fact as to whether such a warrant would have issued. This is so because there is, at most, conflicting evidence as to whether the officers had information that the suspects were armed. Since a question of fact exists, I join Judge Pooler's judgment that we lack jurisdiction to hear this qualified immunity appeal. In other words: because the issue of whether a warrant for an *unannounced* invasion of McColley's apartment would have issued had Riley provided in his warrant affidavit all the information he had requires the resolution of factual questions, I join Judge Pooler in concluding we do not have jurisdiction, and that this case ought to be returned to the district court for a jury trial.

## I.

The issue this case presents is whether a police officer should be held liable for obtaining a warrant based on an affidavit that lacked relevant information known to the officer.[2] All of us agree that, to answer this question, we are to imagine a corrected affidavit which included the omitted facts and then consider whether, on the basis of such an affidavit, a magistrate would still have issued the warrant. Where my colleagues—and previous panels of this Court—part ways is on the question of whether this can be determined as a matter of law, or whether the weight a magistrate would have given the omitted information is instead a question of fact which must be decided by a jury. If it is the latter, the factual nature of the dispute would strip us of jurisdiction over this interlocutory appeal.

Troublingly, our Court's precedents provide support for both conclusions.

## A.

More than two decades ago, this Court stated that "[w]hether an item of information is material or not [to a probable cause determination] is, in the

---

[2] My colleagues dispute whether a *general* warrant could issue. As indicated above, I believe that the more germane question to be whether a *no-knock* warrant—the kind of warrant that was actually issued in this case—was justified.

context of a motion for summary judgment, a mixed question of law and fact. The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. The factual component requires an inference as to whether the information would likely be given weight by a person considering that question." *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991) (citations omitted).[3] In *Golino*, we upheld then-District Court Judge Cabranes's decision to send the probable cause determination to a jury. "The weight that a neutral magistrate would likely have given the [omitted or misrepresented] information," we said, "is not a legal question but rather is a question to be resolved by the finder of fact." *Id.* at 872.

In *Velardi v. Walsh*, 40 F.3d 569 (2d Cir. 1994), we explained further that applying the corrected affidavit doctrine does not involve "review[ing] a magistrate's prior determination of probable cause, but rather try[ing] to predict whether a magistrate would have found probable cause if he had been presented with truthful information." *Id.* at 574 n.1. Since "the weight that a neutral

---

[3] Importantly, we have jurisdiction over an interlocutory order denying qualified immunity *only* where the questions to be determined are legal, rather than factual. *See, e.g., Locurto v. Safir*, 264 F.3d 154, 163 (2d Cir. 2001); *Johnson v. Jones*, 515 U.S. 304, 314, 319-20 (1995); *accord Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995).

magistrate would likely have given such information is a question for the finder of fact," we held that "summary judgment is inappropriate in doubtful cases." *Id.* at 574.[4]

We have restated this holding recently. *See Southerland v. City of New York*, 680 F.3d 127, 144 (2d Cir. 2012). As the *Southerland* Court said, quoting an earlier opinion by Judge Raggi: "[A] court may grant summary judgment to a defendant based on qualified immunity *only if* 'the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the corrected affidavits.'" *Southerland*, 680 F.3d at 144 (quoting *Walczyk v. Rio*, 496 F.3d 139, 158 (2d Cir. 2007)) (emphasis added).

**B.**

Alongside these cases, however, runs another line of precedents that treat determinations of probable cause as questions of law, to be made by the court

---

[4] This, of course, left room for cases which were *not* doubtful. A factual dispute might be so lopsided that it could be decided as a matter of law, as *Velardi* recognized. *See id.* ("[I]f the evidence, viewed in the light most favorable to the plaintiffs, discloses no *genuine* dispute that a magistrate would have issued the warrant on the basis of the 'corrected affidavits,' then under the ordinary standard for summary judgment, a qualified immunity defense must be upheld." (citation omitted)). Judge Raggi—in her first ground for decision—indicates that she thinks that this is just such a lopsided case. *See* Dissenting Op., *post* at 3-21.

rather than a jury. For example, in *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir. 1992), we said that "after the affidavit ha[d] been corrected in a light most favorable to the plaintiffs, the district court should then have determined whether as a matter of law it did or did not support probable cause." Qualified immunity should be granted at the summary judgment stage, *Cartier* instructed, "if the affidavit accompanying the warrant is sufficient, after correcting for material misstatements or omissions, to support a reasonable officer's belief that probable cause existed."[5] *Id.* (internal quotation marks omitted).

This standard was quoted, and restated, in *Escalera v. Lunn*, 361 F.3d 737, 743-44 (2d Cir. 2004). As Judge Raggi notes, Dissenting Op., *post* at 2, *Escalera* held that "summary judgment should be granted to the defendant on the basis of qualified immunity" whenever a corrected affidavit provides "an objective basis

---

[5] *Cartier*'s instruction was cited in *Smith v. Edwards*, 175 F.3d 99 (2d Cir. 1999) (Sotomayor, J.), which called for courts, in material omission cases, first to correct the warrant affidavit and "then determine whether as a matter of law the corrected affidavit did or did not support probable cause." *Id.* at 105 (quotation marks and brackets omitted). *Smith* is ambiguous, however, as to whether probable cause can always be determined as a matter of law once the facts in a corrected affidavit are stipulated; the case could instead be read to mean no more than that courts should employ the ordinary summary judgment test in regard to the corrected affidavit, and ask whether all reasonable factfinders would come out the same way on the question of probable cause.

to support arguable probable cause."[6] We wrote there—optimistically, I believe—"Our case law is clear," that when considering a qualified immunity claim, "'a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of [arguable] probable cause." *Id.* (quoting *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997)). Notably, the bracketed addition—"[arguable]"—was *Escalera*'s. The case it quoted, *Martinez* (like the case *Martinez* itself quoted, *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993)), had, instead, instructed courts to "determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause"—not *arguable* probable cause. *Escalera* is important, therefore, for having first made "arguable probable cause" part of the corrected affidavits doctrine in our Circuit.

Judge Raggi's opinion for the Court in *Walczyk v. Rio* followed *Escalera* in this regard, observing that while probable cause for one of the searches at issue in that case was lacking, due to stale information in the warrant affidavit,

---

[6] Quoting *Golino*, *Escalera* says that "arguable probable cause" exists "'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Escalera*, 361 F.3d at 743 (quoting *Golino*, 950 F.3d at 870).

8

"defendants might still be entitled to claim qualified immunity from liability for damages if the search was supported by 'arguable probable cause.'" 496 F.3d at 163. Notably, however, in *Walczyk*, the Court found that arguable probable cause might obtain not because of some hypothetical disagreement among reasonable officers about probable cause, but rather because it was unclear which of the defendants in that case knew or should have known that the information in their affidavit was stale. *See Walczyk*, 496 F.3d at 163.

This understanding of arguable probable cause is an eminently sensible one. But it is not the understanding used in *Escalera*, and it is not the understanding Judge Raggi employs in her opinion in the case now before us. In these two instances, unlike in *Walczyk*, arguable probable cause is not used to shield officers who may have been unaware of whatever evidence negated probable cause. Instead, here, arguable probable cause is made to encompass warrant affidavits which, though unable to establish probable cause, can be excused as "close enough for government work." This, I take it, is what Judge Raggi means in the instant case when she asserts that, even if probable cause is not established by the corrected affidavit, arguable probable cause still obtains because "officers of reasonable competence could disagree" as to whether the

9

probable cause test was met. Dissenting Op., *post* at 36 (quoting *Escalera*, 361 F.3d at 743). Or, to put it still more generously for qualified immunity: arguable probable cause obtains whenever it would not have been "plainly incompetent" for an officer to find probable cause on the basis of the corrected affidavit. *Id.* at 23 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) .[7]

---

[7] Then-Judge Sotomayor took issue with this understanding of arguable probable cause in her concurring opinion in *Walczyk*. As she explained:

> Whether reasonably competent officers could disagree about the lawfulness of the conduct at issue, however, is not the same question the Supreme Court has repeatedly instructed us to consider: whether it would be clear to *a reasonable officer* that his or her conduct was unlawful in the situation he or she confronted. . . . [O]ur requirement of consensus among all reasonable officers departs from Supreme Court dictates and unjustifiably raises the bar to liability for violations of constitutional rights.
>
> Asking whether "officers of reasonable competence could disagree" shifts this inquiry subtly but significantly. Instead of asking whether the defendant's conduct was beyond the threshold of permissible error, as the reasonable officer standard does, this inquiry affords a defendant immunity unless a court is confident that a range of hypothetical reasonably competent officers *could not disagree* as to whether the defendant's conduct was lawful. This standard is not only more permissive of defendants seeking to justify their conduct; it also takes courts outside their traditional domain, asking them to speculate as to the range of views that reasonable law enforcement officers might hold, rather than engaging in the objective reasonableness determination that courts are well-equipped to make.

496 F.3d at 169-70 (Sotomayor, J., concurring) (quotation marks, citations, and alterations omitted).

By distinguishing this from the other understanding of arguable probable cause, I do not mean to suggest that the understanding of probable cause that Judge Raggi employs in the present case lacks precedential support. In fact, it can be derived from *Golino*'s two-pronged description of qualified immunity, which protects officers if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." 950 F.2d at 870 (citing *Malley*, 475 U.S. at 341). *Walczyk* turned on the "objectively reasonable" prong; *Escalera* and this case both implicate the "reasonable disagreement" prong. The latter adds, however, a nimbus of protection around probable cause, which allows officers to make objectively unreasonable probable cause determinations so long as the officers themselves are reasonably competent.

To be clear: my objection to Judge Raggi's understanding of arguable probable cause is not that it lacks precedential support. Rather, the ample support it has cannot be reconciled with the equally extensive precedents cited in Judge Pooler's opinion. It is to this conflict that I now turn.

## C.

If corrected affidavits always established, or failed to establish, probable cause so clearly that no reasonable judge or juror could find otherwise, our Court's precedents would cause no confusion. The confusion arises in the middle: in cases where some reasonable judges or jurors would, and others would not, find probable cause on the basis of the corrected affidavit. To put it another way, confusion arises when reasonable people disagree about the weight a magistrate would give the corrected affidavit.

Importantly, these two formulations describe the same underlying questions. Disagreements about whether a corrected affidavit establishes probable cause are identical to disputes over how much weight a magistrate would have given to the omitted evidence. Such evidence, after all, is deemed weighty enough to be material only if it would have altered the magistrate's probable cause determination. But this can only be decided by asking whether probable cause actually remains once the evidence is considered. To call the question of weight a genuine question of fact is merely to say that reasonable people could disagree about whether probable cause would still obtain.

And therein lies the problem. On the one hand, some of our cases do say that determining the weight a magistrate would give omitted evidence is a question of fact. And that question eludes summary judgment if, but only if, reasonable factfinders could disagree about the answer—that is, about whether probable cause would still be found. Yet, if reasonable people disagree about the existence of probable cause, then *arguable* probable cause has, by definition, been established under others of our cases! Since *arguable* probable cause exists whenever reasonable people disagree about the existence of *actual* probable cause, no case of this sort should ever go to a jury. Either a court will decide probable cause (one way or the other) as a matter of law, or the court will find that probable cause is open to reasonable dispute and will on that basis dismiss the case, again as a matter of law, on qualified immunity grounds. But, to continue around the circle of our cases, this, of course, conflicts with the clear holding of *Velardi* that "doubtful cases" must be sent to a jury. 40 F.3d at 574.

Judge Raggi is well aware of *Velardi*'s holding; she refers to it, in fact, both in *Walczyk*, *see* 496 F.3d at 158, and her opinion here, Dissenting Op., *post* at 6 ("To the extent *Velardi* observed that the weight a judicial officer would give omitted information is a question of fact, disputes as to that question might

13

require a jury trial in 'doubtful cases' of probable cause . . . .").[8] She does not explain, however, how "doubtful cases of probable cause" can ever be anything other than "cases of arguable probable cause." It would follow that in such circumstances, unless defendants somehow fail to raise a qualified immunity defense, a jury trial would *never* be required.

By identifying, as I believe I have, this conflict in our cases, I do not mean to suggest that one side, rather than the other, is the "correct" one. It is only to say that we are dealing with two confusing, and at times confused, lines of cases. Our Court would do well to provide clarity in this area. But the task is not an easy one, and, in any event, this case does not require us—and thus does not allow us—to undertake it. We need not resolve the tension I have described because the only question this case *requires* us to confront—whether the particular warrant that was granted still would have issued had the affidavit

---

[8] In the preceding sentence, Judge Raggi states, citing *Walczyk*, 496 F.3d at 157, that "the existence of probable cause is *generally* a matter of law for the court." Dissenting Op., *post* at 6 (citing *Walczyk*, 496 F.3d at 157) (emphasis added). "Generally" here would seem to suggest that sometimes, at least—presumably in those "doubtful cases" mentioned in the next sentence—a jury might be needed. But what Judge Raggi does not acknowledge, even as she cites *Velardi*, is that her notion of arguable probable cause swallows all such doubtful cases, ensuring that *Velardi*'s promise—sometimes—of a jury trial will in fact never be realized.

been more complete—can be easily answered, I believe, under either line of our case law.

## II.

Although my colleagues disagree about whether the information Riley omitted from his affidavit might have changed a magistrate's mind about the existence of probable cause to search McColley's apartment for drugs, the question in this case, and hence in their dispute, is whether Riley violated McColley's Fourth Amendment right to be free from unreasonable searches and seizures. Significantly, our Court has said that "[t]he *method* of an officer's entry into a dwelling is among the factors to be considered in assessing the reasonableness of a search under the Fourth Amendment." *United States v. Tisdale*, 195 F.3d 70, 72 (2d Cir. 1999) (per curiam) (emphasis added).

Here, the method of entry was more akin to a military invasion than the knocking and entering envisioned, and generally required, by our law. *See Wilson v. Arkansas*, 514 U.S. 927, 931-32 (1995). As Judge Pooler describes in her opinion, members of Troy's Emergency Response Team, at six o'clock one morning, shattered the window of McColley's living room and threw a flash-bang grenade inside before breaking down the door and storming in, brandishing automatic

15

weapons. Because McColley was given no warning before their entry, she was wearing only a t-shirt and underwear when the officers burst in. Thus attired, she was handcuffed and forced to lie face-down on her bed while an officer guarded her, weapon drawn, and a dog searched her room. By the time the police had left—having discovered only an electric bill and McColley's college course schedule—McColley's furniture had been overturned, her rug and wall bore burn marks, her bookshelf, window, and doors had been broken, and her toiletries and clothes, along with her daughter's, had been strewn across the floor.

The trauma caused by a search of this sort was well described by a unanimous Supreme Court in *Richards v. Wisconsin*:

> While it is true that a no-knock entry is less intrusive than, for example, a warrantless search, the individual interests implicated by an unannounced, forcible entry should not be unduly minimized. . . . [T]he common law recognized that individuals should be provided the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry. These interests are not inconsequential. Additionally, when police enter a residence without announcing their presence, the residents are not given any opportunity to prepare themselves for such an entry. . . . The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed.

520 U.S. at 393 n.5 (citations omitted).

Because no-knock searches impinge so seriously upon both privacy and property interests, they are justified only if police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."[9] *Id.* at 394; *Tisdale*, 195 F.3d at 72. In *Richards*, the Supreme Court specifically disallowed blanket exceptions to the common law knock-and-announce requirement; in particular, the Court struck down the Wisconsin Supreme Court's rule "that police officers are *never* required to knock and announce their presence when executing a search warrant in a felony drug investigation." *Id.* at 387-88 (emphasis in original).

In his application to search McColley's apartment, Riley requested a warrant that could be "executed at any time of the day or night" and that authorized officers "to enter the premises to be searched without giving notice of his [*sic*] authority and purpose." J.A. 188. These requests were based on (what Riley described as) his reasonable cause to believe (1) that "[t]he property sought

---

[9] We note that, as Judge Raggi states in her dissent, the police need only reasonable suspicion, and not probable cause, that knocking and announcing would be dangerous or futile. As we will demonstrate below, there exists an issue of fact that must be resolved before even this standard is met.

may be easily and quickly destroyed or disposed of" and (2) that giving notice "may endanger the life or safety of the executing Police Officers." *Id.* According to Riley's affidavit, these beliefs were based on "the physical properties of [the] contraband"; the "common practice of persons who are involved in the illicit use and trafficking of controlled substances to attempt to remove, destroy or dispose of said controlled substances if notice . . . is given"; and Riley's personal experience that giving notice allows suspects "time to prepare themselves," thereby endangering officers' safety. *Id.*

In addition to this boilerplate, Riley included in his application that 396 First Street was under the custody and control of "Stink," a drug dealer and "soldier" for another dealer, "Chuck." "Stink" was also said to sell marijuana and crack cocaine out of 396 First Street. Although Riley described the residents of the other apartments for which he obtained a search warrant, he failed to tell the magistrate that McColley and her then four-year-old daughter lived at 396 First Street. And although Riley described the female resident of *another* targeted apartment as someone who "deals approximately one hundred grams of marijuana a week," J.A. 177, he did not tell the magistrate that the *known residents* of 396 First Street had no criminal history. Riley, finally, failed to tell the

18

magistrate that police surveillance had failed to observe any criminal activity at all during surveillance of McColley's apartment carried out over the course of three days.

Each of these omissions is legally relevant, and highly so, to the decision of whether to issue a *no-knock* warrant. Given that the apartment to be searched was home to a woman and child with no criminal record and, moreover, did not appear to be a hub of ongoing criminal activity, it would certainly seem possible for the search to have been "conducted at a time when the only individuals present in a residence ha[d] no connection with the drug activity and thus [would] be unlikely to threaten officers or destroy evidence." *Richards*, 520 U.S. at 393. Riley's justification for the inactivity at McColley's apartment—his stated belief that it was a "stash house," J.A. 312—itself weighed against the no-knock warrant, since large quantities of stashed narcotics would be difficult to dispose of quickly. *See id.* ("The police could know that the drugs being searched for were of a type or in a location that made them impossible to destroy quickly."). As the *Richards* Court said of such situations, "the asserted governmental interests in preserving evidence and maintaining safety may not outweigh the individual privacy interests intruded upon by a no-knock entry." *Id.*

Judge Raggi's argument, in her dissent, that the "readily disposable form" of the drugs "in zip-loc baggies," Dissenting Op., *post* at 28, justified the no-knock warrant therefore not only goes a long way toward creating the kind of blanket justification for no-knock searches in narcotics investigations that the Supreme Court specifically disapproved of in *Richards*—for when are drugs, by their nature compact in size, not in small packages?—but it also ignores the record evidence that it was in *this* case quite *unlikely* that *all* of the drugs could have been disposed of had a knock-and-announce warrant been issued.  That evidence includes the very fact that 396 First Street was allegedly a "stash" house (which Officer Riley defined generally as a location where the traffickers "would keep money, drugs, and weapons," J.A. 312); that the CI's recollection was that 7 grams of cocaine were being cut with a playing card in open view on an ironing board at 396 First Street; that 100 grams or more of marijuana were allegedly being sold each week from at least one of the residences; and that every time the CI had visited the apartments, "Stink" had made crack cocaine sales. Evidence like this shows that narcotics were out in the open, and that *enough* drugs were present (given the fact that they were "stash[ed]" there, J.A. 312) to make it most

unlikely that the time it takes to knock and announce would be so harmful to the finding of drugs as to justify an unannounced military-style invasion.

In light of the facts known to Riley when he submitted his warrant affidavit, it therefore appears possible, as a matter of law, that the governmental interests Riley asserted here did *not* outweigh the privacy and property interests his no-knock entry infringed. If police were able to invade the quiet home of a law-abiding woman and her child without knocking and identifying themselves, simply because they believed that the home contained drugs, then it is unclear when the police *could ever not* enter unannounced, at least when drugs were being investigated. Yet we know from *Richards* that blanket exceptions to the knock-and-announce requirement are unconstitutional, even in regard to drug searches. To search without first knocking, the government must reasonably suspect that something more than drugs awaits inside. A woman with no known criminal ties and her small child hardly strike me as that "something more."

**III.**

Thus far, I have argued that each potential argument supporting a "no-knock warrant" was lacking, because there was no convincing record evidence that the drugs, sold daily and warehoused in the residence, were easily

disposable and because there would be no reason to believe that a mother and a child with no criminal record posed a danger justifying a "no-knock" warrant. However, one remaining argument requires special consideration.

Judge Raggi asserts that a corrected affidavit would support a reasonable suspicion of danger—and therefore justify a no-knock warrant—based on the officers' belief that Sport, Stink, and Chuck might have been present and *armed* at 396 First Street. *See* Dissenting Op., *post* at 31-33. Judge Raggi admits that the original affidavit only included as justification for a no-knock warrant Riley's general knowledge that drug dealers often possess firearms—precisely the kind of general knowledge that, the Supreme Court has told us, *cannot* support a no-knock warrant. *See Richards*, 520 U.S. at 387-88. She then, however, expands the universe to be considered and, based on other record evidence, concludes that a corrected affidavit would indicate, from the CI's communications, "case-specific" knowledge that "Sport, Stink, and Chuck all had access to and possession of firearms." Dissenting Op., *post* at 31-32. [10] On this basis, Judge Raggi determines

---

[10] I do not here dispute Judge Raggi's trek into the record. It is worth noting that in *Walczyk,* Judge Raggi and the panel were comfortable deciding the issue of probable cause as a matter of law because *they could do so on the face of the affidavits*. *See* 496 F.3d at 157 ("In this case, there can be no dispute as to what facts the defendants relied on to establish probable cause for the challenged arrest and searches; they are memorialized in warrant affidavits. Thus, whether

22

that the more specific requirement that the Supreme Court has held was needed to justify a no-knock intrusion would be present in a corrected affidavit. Judge Raggi rightly does not contend that the officers gleaned this information from the written "voluntary statement" of the CI, but instead from an "operational plan" drafted by Riley, in which he makes passing reference to the notion that the traffickers had access to firearms. *See id.* at 33.

Significantly, however, in testimony Riley makes no such assertion that he believed there would be armed persons at 396 First Street. When asked in his deposition whether there was anything that made him think in particular that there would be weapons in *this* apartment, Riley responded, "Nothing specific." J.A. 411. He then went on to explain—as he had in the operational plan—that the confidential informant knew some of the persons involved in the drug trade here to possess firearms. *Id.*

---

the affidavits, on their face, demonstrate probable cause, is a question of law."). Here, the affidavit does *not* include information about the traffickers being armed, on its face or otherwise, and Judge Raggi's foray into the record in a quest to decide the issue as a matter of law seems to stretch beyond the bounds of *Walczyk.* Indeed, here it is both the case that the fact cannot be gleaned from the affidavit *and* that the fact is disputed by the officers themselves, as I explore below, which makes deciding it as a matter of law all the more troubling . . . to put it mildly.

23

But the record then becomes more complicated: for even this statement by Riley is contradicted. During Officer Rosney's deposition, he said that the officers had no "specific information from the [confidential] informant that [the persons within the residences] were armed." J.A. 259.  He attributed the officers' belief that Sport, Stink, and Chuck may have been armed to the fact that 396 First Street was a "stash house," which made the officers therefore think that the persons within it "would be armed and dangerous" (*i.e.,* based on the kind of generic data held to be insufficient by the Supreme Court!). J.A. 140.

The record evidence is therefore mixed on the key—and for me, fundamental—question of whether or not the officers had a general or specific belief that Sport, Stink, and Chuck had firearms, and therefore whether knocking and announcing would have been dangerous. This is a constitutionally-determinative issue, precisely because, as the Court explained in *Richards*, a general belief that drug traffickers are armed because drug traffickers *typically* are armed cannot support a no-knock warrant. *See* 520 U.S. at 394. Just what the officers knew therefore becomes a critical question of fact. Whether they had, as Rosney says, only a general belief that the persons would be armed simply because they were involved in narcotics trade or whether they had, as Riley says,

24

a particularized belief based on the confidential informant's statements or other evidence, is crucial and cannot be concluded *as a matter of law* based on the record before us.

I therefore think there is a critical issue of material fact for the jury and that we must return the case to the district court on that ground. That said, I want to make clear that it may well be the case, even apart from the factual dispute, that the officers would have had no reason to think that these drug traffickers—even if they had access to firearms—would be at McColley's residence armed in the wee hours of the morning. There may have been, in short, no *particular*—or, to use Riley's word, "specific"—reason to suspect that knocking and announcing at the home of a mother without a criminal record in the early morning hours, when it would be likely that "the only individuals present in [the] residence have no connection with the drug activity," *Richards*, 520 U.S. at 393, would have been dangerous. In light of this and the other circumstances suggesting that a military-like invasion into a the home of a mother without a criminal record was unjustified, one could reasonably be disposed to conclude as a matter of law, regardless of how the factual dispute about firearms is resolved, that a magistrate would not have properly issued a "no-knock" warrant for the search

of McColley's apartment, and on that basis one might be well inclined to affirm the district court's denial of Riley's motion for summary judgment.

But we need not, and hence should not, go that far. In light of the fact that there is conflicting evidence on whether the officers had a particularized belief—as against only the generalized conjecture that drug traffickers typically have firearms—that Sport, Stink, and Chuck were armed, there is indisputably a question of fact on an important issue. And that question precludes summary judgment and deprives us of jurisdiction over this interlocutory appeal.

This conclusion, moreover, seems to me to be required even under Judge Raggi's more capacious standard of "arguable reasonable suspicion." *See Escalera*, 361 F.3d at 743. That is, the question of fact as to whether the officers had a particularized belief that the drug traffickers were likely to be armed bears directly upon whether the officers could have held an "objectively reasonable" belief they would be in danger if they knocked and announced at 396 First Street. *See id.*; *see also Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005). We cannot here decide what, under the Supreme Court's standard, the officers reasonably suspected until we resolve the essentially and unavoidably factual conflict reflected in their inconsistent statements as to whether or not they

thought the drug traffickers had firearms and would be armed. Because there is a "dispute as to what facts [the officers] relied on," *Walcyk*, 496 F.3d at 157, we cannot conclude "as a matter of law, that [a] corrected affidavit would have been sufficient," *Smith*, 175 F.3d at 105-106 n.5, to support a no-knock warrant. And this is so regardless of whether one follows Judge Raggi's or Judge Pooler's line of cases as to "arguable" probable cause; indeed, it must be resolved before we can find that reasonable suspicion existed.

This disputed and material question of fact is enough for me to conclude that summary judgment was inappropriate under *either* line of this Circuit's cases and, therefore, to join Judge Pooler's holding that we have no jurisdiction over the issue of qualified immunity at this time, and that this case must return to the district court for further proceedings, and possibly proceed to trial.

REENA RAGGI, *Circuit Judge, dissenting:*

My colleagues Judges Pooler and Calabresi conclude, albeit for different reasons, that we lack jurisdiction over this interlocutory appeal from a denial of qualified immunity. Judge Pooler thinks that certain omissions from defendant Michael Riley's affidavit in support of a search warrant for premises inhabited by plaintiff Ronita McColley raise questions of fact as to probable cause to search at all. Judge Calabresi thinks the omissions undermine authorization to conduct the search on a "no knock" basis. I respectfully disagree with both conclusions.

Whatever weight a judicial officer might give the omitted facts here at issue, it would not be enough to give rise to a "genuine dispute that a magistrate would have issued the warrant." Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir. 1994) (emphasis omitted) (concluding that affiant entitled to qualified immunity because factual errors, even if deliberate, could not possibly have affected magistrate's decision to issue warrant). This is because an affidavit that includes the omitted information demonstrates probable cause to search as a matter of law. See Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999) (Sotomayor, J.) (instructing that "[i]f

1

probable cause remains" after warrant is corrected, plaintiff has suffered no violation of Fourth Amendment rights (internal quotation marks omitted)).  The same conclusion obtains with respect to no-knock execution of the warrant, which required a showing only of reasonable suspicion—not probable cause—that law enforcement officers would be endangered or evidence would be destroyed if officers announced their presence before entering the target premises.

Even if there were any doubt as to actual probable cause or reasonable suspicion in this case—which I submit there is not—the determinative issue for purposes of qualified immunity is not what weight the issuing judge would assign to omitted facts in reviewing a corrected affidavit, but whether an officer in defendant's position could have held an objectively reasonable—even if mistaken—belief that the corrected affidavit demonstrated the necessary probable cause and reasonable suspicion.  This is evident from Escalera v. Lunn, 361 F.3d 737 (2d Cir. 2004), which held that if a corrected affidavit provides "an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity."  Id. at 744.  As Escalera explained,

2

"[o]nly if the corrected affidavit would not support a reasonable officer's belief that probable cause existed would the identified factual disputes be material" so as to warrant denial of qualified immunity. Id. (internal quotation marks omitted); see also Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012) (stating that qualified immunity provides officials with "breathing room to make reasonable but mistaken judgments" (internal quotation marks omitted)); Malley v. Briggs, 475 U.S. 335, 341 (1986) (stating that qualified immunity is available where "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context).

Upon review of a corrected affidavit, I identify no material question of fact as to the existence of probable cause to search or reasonable suspicion to do so on a no-knock basis, much less any dispute as to the existence of arguable probable cause or reasonable suspicion. Accordingly, I would exercise jurisdiction and order that judgment be entered in favor of Riley on grounds of qualified immunity. See Escalera v. Lunn, 361 F.3d at 743 (stating that we have jurisdiction to award summary judgment where no material factual dispute exists as to qualified immunity); Tierney v. Davidson, 133 F.3d 189, 194–95 (2d Cir. 1998) (same). I therefore respectfully dissent.

3

A.    The Corrected Affidavit

To explain my disagreement, I start by discussing the warrant at issue, the complained-of omissions from the supporting affidavit, the "corrected affidavit" standard of review, and the contents of a corrected affidavit in this case.

On June 27, 2008, a Troy city court judge issued search warrants for four premises reportedly used for drug trafficking:  (1) 520 Second Avenue, Apt. 5; (2) Building 5 Griswold Heights, Apartment 17; (3) 17 101st Street, 1st floor apartment; and (4) 396 First Street, 1st floor apartment.  In support of warrants to search the last three locations, defendant Riley, a criminal investigator with the Rensselaer County District Attorney's Office, swore to a common affidavit based largely on information recently obtained from a confidential informant ("CI").

In challenging the search of the First Street apartment where she resided with her daughter, plaintiff McColley contends that Riley misled the issuing judge by omitting certain facts from his supporting affidavit, notably, that (1) McColley, a person with no criminal history, was the record resident of the First Street apartment; and (2) periodic street surveillance starting on June 25, 2008, failed to reveal any evidence of drug activity at the premises.  See Pooler Op., ante at 13.  For

4

McColley to demonstrate that these omissions made the warrant-authorized search of her home unreasonable under the Fourth Amendment, she must show not only that Riley "knowingly and intentionally" omitted the specified information from his warrant affidavit, but also that the omitted facts were "necessary to the finding of probable cause" to search and to the finding of reasonable suspicion to do so on a no-knock basis. Franks v. Delaware, 438 U.S. 154, 155–56 (1978); see Escalera v. Lunn, 361 F.3d at 743.

To make the latter assessment, we look to a hypothetical "corrected affidavit," produced by adding to the original warrant affidavit the omitted information highlighted by McColley as well as any other pertinent omitted information. See Escalera v. Lunn, 361 F.3d at 744 ("In performing this correcting process, we examine all of the information the officers possessed when they applied for the arrest warrant."). We must then determine whether the corrected affidavit does or does not demonstrate the necessary probable cause and reasonable suspicion. See Smith v. Edwards, 175 F.3d at 105.

This is a de novo inquiry, not limited to the deferential "substantial basis" review we conduct when a plaintiff challenges a search incident to a warrant on the

grounds that it was supported by an insufficient, but not deliberately misleading, affidavit. Velardi v. Walsh, 40 F.3d at 574 n.1 (internal quotation marks omitted). Where there is no dispute as to what facts a judicial officer relied on—or in the case of a corrected affidavit, should have relied on—in making a probable cause or reasonable suspicion determination, the existence of probable cause and reasonable suspicion is generally a matter of law for the court. See Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007). To the extent Velardi observed that the weight a judicial officer would give omitted information is a question of fact, disputes as to that question might require a jury trial in "doubtful cases" of probable cause or reasonable suspicion; but, as Justice (then Judge) Sotomayor explained in Smith v. Edwards, that conclusion does not obtain "where a court is able to determine, as a matter of law, that the corrected affidavit would have been sufficient to support a finding of probable cause" or reasonable suspicion. 175 F.3d at 105–06 n.5 (noting that in both Velardi and Smith, court was able to decide, as a matter of law, that corrected affidavit stated probable cause). Thus, if probable cause and reasonable suspicion remain after a warrant is corrected to add omitted information, "no constitutional violation of plaintiff's Fourth Amendment rights has occurred." Id. at 105 (internal

6

quotation marks omitted); see United States v. Rajaratnam, 719 F.3d 139, 147 (2d Cir. 2013); see generally Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Indeed, where a corrected warrant demonstrates probable cause or reasonable suspicion as a matter of law, "any disputed factual issues cannot be deemed 'material,' and summary judgment is warranted" for the defendant. Smith v. Edwards, 175 F.3d at 105.[1]

---

[1] Judge Calabresi is mistaken in suggesting that our precedent is ambiguous as to whether probable cause can be decided as a matter of law based on a corrected affidavit. See Calabresi Op., ante at 4–14. Certainly Golino v. City of New Haven, 950 F.2d 864 (2d Cir. 1991), which he cites, does not signal ambiguity. There, omitted facts contradicted virtually every fact reported to establish probable cause. See id. at 867 (contrasting, for example, (1) reported incriminating statements of murder target's ex-wife with her unreported inconsistent, and even contradictory, statements; (2) reported informant statement linking target and victim with informant's unreported testimonial denial of statement; and (3) reported general description of killer with unreported eyewitnesses' detailed descriptions not fitting target, as well as noting complete failure to disclose that killer's blood type was known and had not yet been compared to target's (which comparison would subsequently exculpate target)). In such circumstances, where a corrected affidavit presents conflicts of fact determinative of probable cause, a reviewing court could not decide probable cause as a matter of law without knowing how the issuing magistrate might have resolved those conflicts—itself a question of fact. See id. at 872. Indeed, unless a magistrate could reasonably discount the contradictions—which is hardly evident from the corrected affidavit in Golino—probable cause would be defeated as a matter of law. Thus, the corrected affidavit, viewed most favorably to the plaintiff, could not admit a finding of

7

A corrected affidavit would here disclose the following facts:[2]

(1) The CI providing information referenced in the affidavit was a person known to law enforcement officials.

(2) The CI had a track record for reliability, having provided information on previous occasions leading to four controlled purchases of drugs and supporting two search warrants that resulted in the seizure of drugs and contraband.

(3) The CI had recently provided authorities with eyewitness information about illegal drug dealing by persons known to him as "Stink" and "Sport," both of

---

probable cause or even arguable probable cause. See Golino v. City of New Haven, 761 F. Supp. 962, 971–72 (D. Conn. 1991) (Cabranes, D.J.) (concluding that court could not decide as a matter of law whether "it was objectively reasonable for [officers] to believe that they were acting in a fashion that did not violate [Golino's] established federally protected right[s]" (internal quotation marks omitted)).

By contrast, here, the omitted facts do not contradict, but only supplement, reported facts. Moreover, for reasons discussed further in this opinion, those supplemental facts, even when viewed favorably to McColley, cannot bear a weight sufficient to defeat the probable cause otherwise established, much less arguable probable cause. Thus, our precedent makes clear that both probable cause and arguable probable cause can be decided favorably to Riley as a matter of law based on the corrected affidavit. See United States v. Rajaratnam, 719 F.3d at 149–50 & n.11, 157 & n.21; Walczyk v. Rio, 496 F.3d at 157; Escalera v. Lunn, 361 F.3d at 744; Smith v. Edwards, 175 F.3d at 105; Velardi v. Walsh, 40 F.3d at 574.

[2]Regular type is used to detail facts reported in the original affidavit; italics are used to detail facts known but omitted from that affidavit.

8

whom worked for "Chuck." The CI described Stink, whom the CI had known since childhood, as a medium-skinned black male with visible eczema, 22 years of age, weighing 190–200 pounds. He described Sport as a dark-skinned black male in his twenties, with short black wavy hair, weighing 155 pounds, and 5'8" tall. The CI provided a cell phone number for Sport.

(4) On June 23, 2008, under the supervision of law enforcement authorities, the CI made a controlled purchase of crack cocaine from Sport at 520 Second Avenue, Apartment 5, a location that the CI described as Sport's residence.

(5) The CI subsequently reported to authorities that approximately one hour after this Second Avenue buy, Sport brought the CI to the first floor apartment at 396 First Street to show the CI where he got his drugs.

(6) The CI stated that Stink has custody and control over the First Street apartment, as well as over the first floor apartment at 17 101st Street and Apartment 5 at 520 Second Avenue, using all three locations to sell crack cocaine and marijuana.

(7) The affiant knew from training and experience that drug dealers often keep their drugs at and operate out of several locations in order to prevent loss from police seizures or home invasions by competing drug dealers.

9

(8) The CI described 396 First Street as an unpainted brick edifice with yellow exterior doors, five buildings south of "Nature's Pub." He also identified the building from a photograph, which was then attached to the warrant affidavit.

(9) *An electronic records check revealed the registered resident of the First Street apartment to be Ronita McColley, a person with no criminal record who lived at the premises with her daughter.*

(10) The CI reported that when he entered the First Street apartment with Sport, the CI saw Stink using a King of Hearts playing card to scrape approximately 7 grams of powder cocaine from a scale. Stink then placed this cocaine into a baggie. Meanwhile, an unknown black male in the apartment gave Sport a sandwich-sized baggie filled with smaller black zip-loc baggies of crack cocaine. The CI reported that these zip-loc baggies were similar in appearance to those involved in the CI's recent purchases of crack cocaine from Sport at 520 Second Avenue.

(11) The CI advised that on approximately 20 to 30 occasions over the last six months, and as recently as the past week, he had been present in Apartment 17 of Building 5 Griswold Heights and, on each occasion, had seen Stink deal drugs from that location.

(12) The CI reported that the registered tenant of the Griswold Heights apartment was Tanisha Bruce, who lived at the location with her two children, mother, and sister. The CI stated that Bruce dealt approximately 100 grams of marijuana per week supplied to her by Stink. He further stated that Stink occasionally stayed at the Griswold Heights Apartment and had custody and control over drug activity at that site.

(13) The CI stated that Stink regularly resided with his girlfriend in the first floor apartment at 17 101st Street. The CI reported having been inside that apartment on two occasions within the past two weeks when Stink sold crack cocaine there.

(14) *Between June 25 and June 27, 2008, law enforcement authorities conducted periodic street surveillance of the outside of each of the premises for which search warrants were sought. That surveillance revealed no evidence of criminal activity.*

(15) The affiant knew from personal experience that, by giving prior notice of execution of a warrant, suspects will have time to prepare themselves against officers' forced entry, which may endanger the lives and safety of the officers and persons inside the residence.

(16) The affiant knew from training and experience that drug dealers often possess firearms and other weapons to safeguard their illegal activities.

(17) *The CI had reported that Stink, Sport, and Chuck all had access to and possessed firearms.*

(18) The affiant also knew from personal experience that it is common practice for drug dealers to attempt to destroy or dispose of drugs upon notice of execution of a search warrant.

B. Probable Cause To Search

1. The Corrected Affidavit Demonstrates Probable Cause as a Matter of Law

In considering whether such a corrected affidavit demonstrates probable cause to search as a matter of law—thereby precluding any genuine dispute as to whether a judge would have issued a search warrant for the First Street apartment—it is useful to recall the standard for probable cause. Probable cause to search exists where circumstances indicate a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013) (stating that "court examines each piece of evidence and considers its probative value, and then

12

looks to the totality of the circumstances to evaluate whether there was probable

cause" (alteration and internal quotation marks omitted)). This "fluid" standard

does not demand "hard certainties" but only facts sufficient to establish the sort of

"fair probability" on which "reasonable and prudent men, not legal technicians,

act." Illinois v. Gates, 462 U.S. at 231–32, 238; see Florida v. Harris, 133 S. Ct. 1050,

1055 (2013) (observing that probable cause is "practical," "common-sensical," "all-

things-considered" standard).[3]

Here, there can be no question as to the "fair probability" that evidence of

drug dealing would be found in the First Street apartment. The corrected

affidavit—like the original one—reported current drug dealing at that location, as

---

[3] Probable cause is not backward looking. Thus, the results of a search are immaterial to a determination of whether the search was supported by probable cause. See United States v. Ramirez, 523 U.S. 65, 71 n.2 (1998) ("In determining the lawfulness of entry and the existence of probable cause we may concern ourselves only with what the officers had reason to believe at the time of their entry." (emphasis in original; alteration and internal quotation marks omitted)); United States v. Di Re, 332 U.S. 581, 595 (1948) ("[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." (footnote omitted)). Just as the discovery of incriminating evidence in the course of a search cannot establish probable cause where none existed, the failure to discover such evidence cannot undermine a satisfactory showing of probable cause. Thus, the failure to find drugs at any of the premises searched in this case is immaterial to our assessment of probable cause.

well as at other sites associated with the same group of dealers. Because the information came from a CI, the "core question in assessing probable cause" to search these premises was whether the information supplied by the informant was sufficiently "reliable." United States v. Wagner, 989 F.2d 69, 72 (2d Cir. 1993). Informant reliability is properly evaluated by reference to the totality of the circumstances. See Illinois v. Gates, 462 U.S. at 232–33. While Judge Pooler's opinion repeatedly references this standard, it in fact fails to apply it, discussing only how the omitted facts might cast doubt on the reliability of the CI's information. Illinois v. Gates, however, specifically requires that a reliability inquiry be holistic and recognizes that deficiencies in one area may well be compensated for by a strong showing in another. See id.; United States v. Steppello, 664 F.3d 359, 364 (2d Cir. 2011) (holding district court erred in considering "individual facts in isolation" when evaluating probable cause). In this case, the totality of the facts in the corrected affidavit so strongly supports the reliability of the CI's information that, even with the addition of the omitted matters, probable cause to search the First Street apartment is established as a matter of law.

14

To begin, the CI was a person known to law enforcement officers and not an anonymous tipster, a circumstance that we have recognized weighs in favor of reliability. See United States v. Elmore, 482 F.3d 172, 180–81 (2d Cir. 2007) (observing that information from known source is generally entitled to more weight than that from anonymous tipster because police can better assess former's reputation and hold him accountable if allegations turn out to have been fabricated); United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) (same).

In addition to being known, the CI here had a proven record of reliability, having provided information in the past that had led to two search warrants resulting in drug seizures and to four controlled purchases of narcotics. We have observed that information provided by an informant from whom the government "has received consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause." United States v. Wagner, 989 F.2d at 73; see also United States v. Sidwell, 440 F.3d 865, 869 (7th Cir. 2006) (holding probable cause existed where "informant had completed numerous other controlled buys in the past and provided, on those occasions, accurate and reliable information").

Moreover, the information provided by this known, reliable CI as to drug dealing in each of the premises for which search warrants were sought was based on his own first-hand observations, a circumstance we have recognized as "easily" establishing probable cause. United States v. Wagner, 989 F.2d at 73 (stating probable cause "easily established" where informant described occasions on which he personally witnessed drug-related activities in suspect's home). That conclusion is only reinforced by the fact that the CI's information here was frequently detailed insofar as it included the street names, physical descriptions and, in one case, the cell phone number, for the two persons whose drug deals the CI had witnessed in the locations for which warrants were being sought. See Illinois v. Gates, 462 U.S. at 234 (recognizing that detailed information entitled to great weight in assessing reliability); United States v. Hernandez, 85 F.3d 1023, 1028 (2d Cir. 1996) (holding that CI's "detailed eye-witness report of crime," such as description of apartment, its occupants, and drug transactions, established probable cause (internal quotation marks omitted)).

Indeed, in the case of drug dealing at the First Street premises, the CI's account was particularly detailed. He reported that "Sport" had taken him to the

First Street apartment approximately one hour after the CI had made a successful controlled purchase of crack from Sport at the dealer's Second Avenue residence. Sport told the CI that the First Street apartment was where he got his drugs and, indeed, the CI saw an unknown man in the First Street apartment supply Sport with baggies of crack that were packaged similarly to the crack the CI had acquired from Sport earlier that same day in the controlled purchase. Further, the CI reported that, in the First Street apartment, he also saw "Stink," a person known to him since childhood, using a playing card, specifically identified as the King of Hearts, to scrape what the CI estimated to be 7 grams of cocaine from a scale into a baggie. The CI related occasions when he had seen Stink deal drugs from two other locations, one his home and the other the residence of a woman identified as Tanisha Bruce.

Additionally, the information provided was current, the CI having witnessed the drug dealing in the First Street apartment only a few days before a search warrant was initially sought and obtained. Cf. Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991) (observing that in cases of ongoing narcotics operations, intervals of weeks or months between described act and warrant application did not necessarily make information stale).

Finally, the information supplied was corroborated in varying respects. Insofar as the CI reported that Stink and Sport used various locations to conduct their drug activity, this found corroboration in Riley's own training and experience, which confirmed that drug dealers frequently operated out of various locations to minimize the risk that they would lose their supplies to police searches or rivals' thefts at a single location. See United States v. Clark, 638 F.3d 89, 98 (2d Cir. 2011) (recognizing even partial corroboration to be relevant to assessment of reliability); United States v. Canfield, 212 F.3d 713, 719–20 (2d Cir. 2000) (same). Moreover, the CI had successfully made a controlled purchase of crack from Sport on June 23, 2008, a circumstance we have recognized as "powerful corroborative evidence" of the CI's reliability in reporting first-hand observations of other drug trafficking by the supplier or his confederates. United States v. Wagner, 989 F.2d at 73. Such a conclusion is especially warranted here, where it was the seller of the drugs involved in the controlled purchase who, within an hour of that transaction, brought the CI to the First Street apartment, representing it to be the place where he got his drugs. We also have denominated as "self-corroborating" detailed reports of drug dealing witnessed first-hand by an informant, such as the CI here provided with

18

respect to his observations inside the First Street apartment. <u>United States v. Smith</u>, 9 F.3d 1007, 1013 (2d Cir. 1993).

By comparison, the omitted information, even when viewed in the light most favorable to McColley, does little to undercut the reliability of the CI's account. Insofar as the record resident of the First Street premises was Ronita McColley, a woman with no criminal record and a young child, the issuing judge already knew that Sport and Stink dealt drugs out of various premises, including one other apartment—at Griswold Heights—where a single mother, Tanisha Bruce, resided with her children. Thus, it could not have made any difference to a judge's probable cause determination to learn that the registered occupant of the First Street premises was also a single mother.[4] Insofar as the CI implicated Bruce in drug trafficking, whereas McColley had no criminal record, the latter fact raises no genuine dispute as to whether the judge would have issued a search warrant. The probable cause question was not whether there was a fair probability to think that McColley herself

---

[4] To the extent the CI described Stink as being in "custody and control" of the three apartments for which search warrants were being sought, the issuing judge already knew from the information provided about Tanisha Bruce that this did not signal exclusive custody or control or preclude another person from being the record resident of the apartment.

was dealing drugs, but whether there was a fair probability to think that evidence of drug dealing would be found in her apartment. That probable cause question must be answered "yes" in light of the reliable CI's detailed account of the drug activity he witnessed inside the First Street apartment on June 23, 2008, and his identification of two of the men involved in that activity.

In short, even if we cannot know the precise weight an issuing judge might give omitted facts about McColley's identity as the record resident of the First Street apartment, we do know, in light of the totality of circumstances strongly indicating the reliability of the CI's information, that the omissions could not bear a weight sufficient to raise a genuine issue as to the existence of probable cause. See generally United States v. Rajaratnam, 719 F.3d at 149–50 & n.11, 157 & n.21 (affirming district court's holding that alleged misstatements and omissions, including omission of informant's criminal history, were not material in light of other indicia of informant's reliability, such as fact that informant was known and had made statements against penal interest, and government was able to corroborate some statements); Velardi v. Walsh, 40 F.3d at 575 (finding omitted facts that drug supplier had not been seen armed and that no drug transactions had taken place at

20

residence to be searched "were simply not material" where affidavits did not imply that supplier was armed or dealing drugs from his home and totality of evidence otherwise established probable cause as matter of law).

The same conclusion applies with even more force to omitted information about the unproductive results of sporadic police surveillance on the exteriors of the premises for which search warrants were sought. Our precedent instructs that an "otherwise sufficient application for a search warrant need not relate unproductive or unsuccessful efforts in the course of the investigation." United States v. Smith, 9 F.3d at 1014. In any event, even when the surveillance results are included in a corrected affidavit, they cannot raise a serious question as to the existence of probable cause because those results indicate only that between June 25 and June 27, 2008, on those occasions when officers had the outside of 396 First Street in view, they did not see any sign of criminal activity. To state the obvious, this hardly precluded drug trafficking on June 23; much less did it foreclose the fair probability that drugs or evidence of prior drug trafficking would be found inside the premises. That probability was so plainly established by the detailed, eyewitness account of a reliable CI that whatever weight a judge might give the surveillance results, it would not be enough to raise a genuine issue of fact as to probable cause.

21

In concluding otherwise, Judge Pooler observes that <u>any</u> omissions from a warrant based on information provided by a confidential informant must be deemed "glaring" and "all the more likely to be 'critical' to the evaluation of probable cause." Pooler Op., <u>ante</u> at 13–14 (quoting <u>Walcyzk v. Rio</u>, 496 F.3d at 161). This reliance on <u>Walczyk</u> is misplaced. What that case states—in a context unrelated to confidential informants—is that "the law does not demand that an officer applying for a warrant 'volunteer every fact that arguably cuts against the existence of probable cause,' as long as he does 'not omit circumstances that are critical' to its evaluation." <u>Walczyk v. Rio</u>, 496 F.3d at 161 (quoting <u>Brown v. D'Amico</u>, 35 F.3d 97, 99 (2d Cir. 1994)). McColley's identity and the surveillance results were not critical to an assessment of probable cause in this case. While these facts did not reinforce the reliability of the CI's information about drug dealing at the First Street apartment, neither did they undermine that reliability as strongly established in this case by the CI's past record for reliability, direct participation in a controlled purchase of drugs from Sport, and detailed eyewitness account of drug dealing by Sport and Stink in the First Street apartment within an hour of the controlled purchase as well as in other premises for which warrants were sought within the preceding two weeks.

22

In sum, on the totality of circumstances presented in the corrected affidavit, I conclude that probable cause to search was so plainly established as a matter of law as to admit no genuine issue of fact as to whether a judge would issue the requested warrants.

### 2. The Corrected Affidavit Demonstrates Arguable Probable Cause

Assuming arguendo that the corrected affidavit did not demonstrate probable cause as a matter of law to search the First Street apartment for evidence of drug dealing, the record will not admit a conclusion that Riley lacked the arguable probable cause that would still entitle him to qualified immunity. Our court has recognized arguable probable cause to exist "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Escalera v. Lunn, 361 F.3d at 742 (internal quotation marks omitted); accord Gonzalez v. City of Schenectady, 728 F.3d 149, 157 (2d Cir. 2013); see also Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002) ("[I]n situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity.").

Here, Riley knew that (1) a known CI, with (2) a record of past reliability, had reported to investigating officers that within an hour of (3) making a successful controlled purchase of drugs from Sport on June 23, 2008, (4) Sport had taken the CI to the First Street apartment where Sport indicated he got his drugs, and (5) therein, the CI witnessed Sport and Stink (a person known to the CI since childhood) package and receive drugs. Riley further knew that the CI (6) had provided detailed descriptions of Sport and Stink, the building on First Street where he was taken, and the activities he had witnessed therein. He also knew that the CI had (7) reported seeing Stink deal drugs on several occasions over the last two weeks at two other identified locations. In light of precedent recognizing each of these enumerated circumstances as indicative of the reliability of the CI's information, see Illinois v. Gates, 462 U.S. at 234; United States v. Rajaratnam, 719 F.3d at 149–50 & n.11, 157 & n.21; United States v. Clark, 638 F.3d at 98; United States v. Elmore, 482 F.3d at 180–81; United States v. Sidwell, 440 F.3d at 869; United States v. Gagnon, 373 F.3d at 236; United States v. Canfield, 212 F.3d at 719–20; United States v. Hernandez, 85 F.3d at 1028; United States v. Smith, 9 F.3d at 1013; United States v. Wagner, 989 F.2d at 73; Rivera v. United States, 928 F.2d at 602, we can hardly label it "plainly incompetent" for an officer in this case to think that there was a "fair probability"

24

that evidence of drug trafficking would still be found in the First Street apartment within a week of the CI's report, <u>Malley v. Briggs</u>, 475 U.S. at 341 (holding that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Nor will the omitted facts permit a different conclusion. Riley knew from his own experience that drug dealers often used multiple sites to store and deal drugs, and the CI had already identified one single mother, Tanisha Bruce, whose residence Stink used to deal drugs. Thus, Riley's discovery that the First Street apartment was registered to another single mother was hardly reason for him to retreat from a fair probability determination that evidence of the drug dealing witnessed by the CI would be found at that location. As for McColley's lack of criminal history, we cannot conclude that no reasonable officer would credit a reliable CI's eyewitness account of drug dealing in a particular location simply because the record resident did not have a criminal record.

Nor can we conclude that no reasonable officer would think he had probable cause to search an apartment where a reliable CI recently witnessed drug activity simply because <u>sporadic</u> surveillance of the <u>exterior</u> of the premises a few days later yielded no results. Quite apart from the fact that such surveillance could not detect

25

activities <u>inside</u> the First Street apartment, probable cause to search the premises did not require evidence of criminal activity on the dates of the surveillance; it required only a fair probability that evidence of criminal conduct occurring at some time be found on the premises. A reasonable officer was entitled to conclude that such a probability was satisfactorily established by the CI's eyewitness account of Sport's and Stink's activities in the First Street apartment on June 23, 2008, within an hour of the CI's controlled purchase of crack cocaine from Sport at another location.

Thus, even if the corrected affidavit does not state probable cause as a matter of law—which I submit it does—it certainly provides "an objective basis to support arguable probable cause." <u>Escalera v. Lunn</u>, 361 F.3d at 744. Because the existence of arguable probable cause renders any factual disputes arising out of omitted information "not material to the issue of qualified immunity," I respectfully submit that the inability to discern what weight a judge might give the omitted information in making a probable cause determination is immaterial to qualified immunity. <u>See id.</u>; <u>accord</u> <u>Gonzalez v. City of Schenectady</u>, 728 F.3d at 155–58 (awarding qualified immunity where arguable probable cause existed for arrest, even though actual probable cause was absent); <u>see also</u> <u>Velardi v. Walsh</u>, 40 F.3d at 573 ("[P]laintiffs may not unwrap a public officer's cloak of immunity from suit simply by alleging

26

even meritorious factual disputes relating to probable cause, when those controversies are nevertheless not material to the ultimate resolution of the immunity issue." (internal quotation marks omitted)).

In the absence of a material factual dispute as to Riley's entitlement to qualified immunity on McColley's probable cause challenge, I respectfully submit that we have jurisdiction to award him summary judgment. See Escalera v. Lunn, 361 F.3d at 743; Tierney v. Davidson, 133 F.3d at 194–95.

C.    Reasonable Suspicion To Execute a No-Knock Search

In concurring in the decision to dismiss for lack of jurisdiction, Judge Calabresi concludes that McColley must be denied qualified immunity because the corrected affidavit fails to support a no-knock entry of the First Street apartment. See Calabresi Op., ante at 15–27.[5]  I cannot agree.

1.    The Corrected Affidavit Demonstrates  Reasonable Suspicion

The Supreme Court has construed the Fourth Amendment to incorporate the common law requirement that police officers entering a dwelling must announce their identity and purpose before attempting forcible entry. See Wilson v. Arkansas,

---

[5] Insofar as McColley challenged the degree of force used in executing the no-knock warrant,  the district court dismissed this claim as insufficient as a matter of law.  This ruling is not before us on this appeal.

514 U.S. 927, 930 (1995); <u>see also</u> 18 U.S.C. § 3109 (codifying knock-and-announce requirement with respect to entries by federal law enforcement officers). For an unannounced, or no-knock, entry to be constitutionally reasonable, police "must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." <u>Richards v. Wisconsin</u>, 520 U.S. 385, 394 (1987). The Supreme Court has declined to recognize categorical exceptions to this reasonable suspicion requirement. Notably, in <u>Richards</u> it rejected the argument that drug felony cases warranted a categorical exception based on the "culture" of violence and evidence destruction that is characteristic of that criminal activity. <u>Id.</u> at 392–94. While <u>Richardson</u> holds that police must make a reasonable suspicion showing "whenever the reasonableness of a no-knock entry is challenged," the Court there emphasized that "[t]his showing is not high," requiring only a "'reasonable belief based on specific and articulable facts.'" <u>Richards v. Wisconsin</u>, 520 U.S. at 394 (quoting <u>Maryland v. Buie</u>, 494 U.S. 325, 337 (1990), and citing <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)).

Applying that standard here, I note that the original affidavit reported not only Riley's general experience with drug dealers' trying to destroy evidence upon learning that law enforcement officers were entering the premises, but also the CI's specific report that the drugs stored at the First Street apartment were packaged in readily disposable form, i.e., zip-loc baggies containing small quantities of crack cocaine. Judge Calabresi dismisses these case-specific facts with a seemingly rhetorical question: "when are drugs, by their nature compact in size, not in such small packages?" Calabresi Op., ante at 20. In fact, our case law easily demonstrates that drugs are frequently packaged in much larger sizes than were evident in this case. See, e.g., United States v. Roberts, 660 F.3d 149, 153–54 (2d Cir. 2011) (discussing seizure of five one-kilogram "bricks" of cocaine); United States v. English, 629 F.3d 311, 313–14 (2d Cir. 2011) (discussing 5 and 10 kilogram packages of cocaine); United States v. Navas, 597 F.3d 492, 495–96 (2d Cir. 2010) (discussing 230 kilograms of cocaine hidden under metal roof of trailer); United States v. Valentine, 530 F.3d 88, 89 (2d Cir. 2008) (discussing cocaine concealed inside furniture); United States v. Beltempo, 675 F.2d 472, 474 (2d Cir. 1982) (discussing 16 pounds of heroin concealed in false bottoms of suitcases). In any event, the Supreme Court in Richards specifically recognized "the easily disposable nature of the drugs"

29

in that case as a factor justifying the no-knock entry at issue. 520 U.S. at 396 (holding that petitioner's "apparent recognition of the officers combined with the easily disposable nature of the drugs" justified "decision to enter without first announcing their presence and authority"). The same case-specific conclusion applies here. See also United States v. Banks, 540 U.S. 31, 40 (2003) (recognizing "opportunity to get rid of cocaine" as highly relevant to reasonableness of forced entry); United States v. Bynum, 362 F.3d 574, 581 (9th Cir. 2004) (concluding no-knock entry justified where officers possessed "reasonable suspicion" that defendant "might dispose of the small rocks of crack cocaine" at issue upon becoming aware of their presence).

In urging otherwise, Judge Calabresi submits that the First Street apartment was "allegedly a 'stash' house," where "enough drugs were present" to make it "quite unlikely that all of the drugs could have been disposed of had a knock-and-announce warrant been issued." Calabresi Op., ante at 20 (emphasis in original). The facts cited by Judge Calabresi to support this conclusion, in fact, belie it. See id. The 7 grams of cocaine that the CI saw in the First Street apartment translates to one-quarter ounce. Even assuming that 10 or 20 times that amount was "stashed" in the First Street apartment at any given time, this suggests a retail operation whose on-hand drug quantities could easily be disposed of quickly. Indeed, the conclusion is

reinforced by Judge Calabresi's reference to the 100 grams or more of marijuana trafficked each week from the Griswold Heights apartment, which totals approximately one ounce. In any event, I hesitate to conclude that no-knock warrants should issue only when there is a risk that all the drugs sought will be destroyed if police first announce their presence. Drug quantity is, after all, an element of various federal drug trafficking crimes. See 21 U.S.C. § 841(b). Thus, even the partial destruction of drugs might "inhibit the effective investigation" of such crimes so as to support a no-knock warrant. Richards v. Wisconsin, 520 U.S. at 393. Indeed, in Richards, the Supreme Court suggested that it was the impossibility of destroying the drugs being sought, not the unlikelihood of complete destruction, that might preclude a no-knock warrant. See id. (observing that where "drugs being searched for were of a type or in a location that made them impossible to destroy quickly," no-knock warrant would not be necessary (emphasis added)).

The facts thus far discussed were, in any event, all known to the magistrate who authorized a no-knock search. His finding of a reasonable suspicion of destruction is not undermined when the facts of McColley's record residence and lack of criminal record are added to a corrected affidavit. As the First Circuit has sensibly observed, "even an occupant not complicit in the drug crime" at issue may

31

have a "strong motive to destroy evidence" upon learning that police are about to search the premises. United States v. Antrim, 389 F.3d 276, 281 (1st Cir. 2004).

In addition to reasonable suspicion of evidence destruction, moreover, a corrected affidavit supports a reasonable suspicion of danger if officers had knocked and announced their presence before executing the four no-knock warrants obtained on June 27, 2008. While the original affidavit reported Riley's general knowledge, based on training and experience, that drug dealers often possess firearms and may defend against police entries if given notice of a search warrant's execution, the corrected affidavit indicates Riley's specific knowledge, communicated to him by the CI, that Sport, Stink, and Chuck all had access to and possession of firearms. See Escalera v. Lunn, 361 F.3d at 744 (stating that correcting process examines "all" information possessed by officers at time of warrant application). This was a case-specific, articulable basis for suspecting that the officers might confront armed persons if they knocked and announced their presence before entering the First Street apartment. See generally United States v. Ramirez, 523 U.S. 65, 71 (1998) (upholding no-knock entry where informant notified police that violent prison escapee, with access to weapons, might be in home); United States v. Brown, 52 F.3d

415, 421–22 (2d Cir. 1995) (holding no-knock entry reasonable where confidential informant told police that violent cocaine dealer was armed).

Judge Calabresi suggests that there is a dispute of fact as to whether the CI in fact reported that Sport, Stink, and Chuck had access to and possession of firearms because Officer Rosney, one of the officers who participated in the search of the First Avenue apartment, in deposition testimony, answered "No" when asked if he had "any specific information from the informant" that individuals in that premises "were armed." J.A. 259; see Calabresi Op. at 19. But as Rosney's deposition testimony further shows, he did not participate in debriefing the CI, see J.A. 138–39, so the fact that he had no specific information from the CI about the targets' firearms possession hardly undermines Riley's representation as to what he was told by the CI. In his own deposition, Riley was careful to testify that the information he had about weapons in the First Avenue Apartment was "nothing specific," which is consistent, not at odds, with Rosney's deposition testimony. J.A. 411. But, as Riley made clear in his very next sentence, what he did know was that "[t]he informant, because he's known some of these individuals for many, many years, knows them to carry firearms." J.A. 411. Thus, the Operational Plan that Riley prepared on June

33

30, 2008, advised all officers participating in the July 3 searches that the "C/I states that Targets all have access to & possess firearms." J.A. 149. Because Rosney was one of the officers listed to receive a copy of this plan, his negative response to a deposition query about CI information can only be understood to indicate either that he had forgotten what he had read in the Operational Plan or, like Riley himself, did not consider it "specific information" of weapon possession, or did not consider it information that he himself had obtained from the CI. In any event, it cannot be construed to create a genuine dispute of fact as to Riley's own report of what the CI told him about the targets' access to and possession of firearms. Thus, Riley's Operation Plan statement is properly included in a corrected affidavit.

What police did not know was in which of the four apartments the targets would be found at the precise time of the searches. In this respect, Riley's original affidavit told the judge who initially authorized the four no-knock entries that, based on the CI's information, Sport was thought regularly to reside at the 520 Second Avenue apartment while Stink was thought regularly to reside at the 17 101st Street premises, although occasionally staying at the Griswold Heights apartment. The issuing judge was told that Stink controlled the latter two premises

as well as the First Street apartment, but he was never told that Stink, or any of the other confederates resided at or stayed in the First Street apartment. Rather, the judge was provided with facts indicating that the confederates stored drugs at the First Street location, and that the CI had witnessed them packaging and retrieving drugs from that location within the last week. On these circumstances, the issuing judge could reasonably have concluded that, even if the target drug dealers did not reside at the First Street apartment, there was a sufficient possibility that one or more of them would be present and armed at the time of any search to support a reasonable belief that officers who knocked and announced their presence before entering would be at risk of harm.

No different conclusion obtains when the warrant affidavit is corrected to identify McColley as the record resident of the First Street apartment. As just stated, the issuing judge knew that Sport and Stink both resided elsewhere. Further, as noted with respect to probable cause, the issuing judge knew that these drug dealers used another apartment occupied by a single mother and her children to deal drugs. Thus, identifying McColley and her daughter as the residents of the First Street apartment would not have negated the facts supporting a reasonable suspicion of

35

danger to the officers from announced entry. See generally United States v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001) (holding reasonable suspicion supporting no-knock warrant remained when application corrected to include presence of children in home). Indeed, their presence in the First Street apartment would only have enhanced the risk of harm, to McColley and her daughter as well as the officers, if armed drug dealers on the premises were alerted to police execution of a search warrant.

In sum, because the "particular circumstances" of this case raised a real possibility that (1) executing officers could confront armed drug traffickers in any of the four apartments to be searched, and (2) the drugs thought to be stored in the First Street apartment were easily disposable, there was a sufficient basis to satisfy the "not high" requirements of reasonable suspicion articulated in Richards. 520 U.S. at 394; see also United States v. Washington, 340 F.3d 222, 227 (5th Cir. 2003) (holding confidential informant report that "suspect was selling drugs and was typically armed . . . sufficient to establish a reasonable suspicion of danger").

2.   The Corrected Affidavit Supports Arguable Reasonable Suspicion

Even if the corrected affidavit did not thus demonstrate reasonable suspicion to support a no-knock entry into the First Street apartment, Riley would still be

36

entitled to qualified immunity as long as the affidavit established arguable reasonable suspicion, i.e., that it was objectively reasonable for Riley to believe that reasonable suspicion existed or that officers of reasonable competence could disagree as to whether the reasonable suspicion test was met. See Escalera v. Lunn, 361 F.3d at 743; Holeman v. City of New London, 425 F.3d 184, 191 (2d Cir. 2005) (holding that even if "facts were insufficient to satisfy probable cause or reasonable suspicion," officer's "belief that they were was objectively reasonable, and therefore protected by qualified immunity"); see also Eldredge v. Town of Falmouth, 662 F.3d 100, 106 (1st Cir. 2011) (holding arguable reasonable suspicion sufficient to support qualified immunity); Jackson v. Sauls, 206 F.3d 1156, 1165–66 (11th Cir. 2000) (same). For the reasons stated in the preceding section, I think we must conclude that Riley had at least arguable reasonable suspicion to think that evidence would be destroyed and officers would be in danger if they knocked and announced their presence before entering the four apartments, including the First Street apartment, associated with the targets of the drug trafficking then under investigation.

That conclusion is only reinforced by our case law, which indicates that when Riley applied for the no-knock warrants at issue in 2008, it was hardly clear that

37

reasonable suspicion was absent here.  See Gonzalez v. City of Schenectady, 728 F.3d at 154 ("[Q]ualified immunity shields official conduct that is objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." (internal quotation marks omitted)).  Indeed, recent summary orders from this court have identified reasonable suspicion in circumstances bearing some similarities to this case.  See United States v. Harper, 421 F. Appx. 108, 110 (2d Cir. 2011) (upholding no-knock warrant where officers "reasonably believed that firearms were present in Harper's home and that announcing their presence therefore would be dangerous"); United States v. McCloud, 303 F. Appx. 916, 918 (2d Cir. 2008) (holding challenged no-knock authority supported by reasonable suspicion based on "affiant's experience that the drug evidence that was the object of the search could be readily destroyed upon notice of entry"); see also United States v. Tisdale, 195 F.3d 70, 73 (2d Cir. 1999) (holding that, where drugs at issue were described in warrant affidavit as being in "readily disposable form," it was not "entirely unreasonable" for officer to rely on no-knock warrant (internal quotation marks omitted)).

In sum, based on the particularized information in the corrected affidavit detailed in this opinion, as well as our own case law, it cannot be said that Riley was "plainly incompetent" or "knowingly violate[d] the law" in concluding that reasonable suspicion of danger and evidence destruction supported a no-knock entry into the First Street apartment. <u>Malley v. Briggs</u>, 475 U.S. at 341.

\* \* \*

To conclude, because I am convinced that the challenged search warrant is supported, as a matter of law, by both probable cause to search the First Street apartment and reasonable suspicion to do so on a no-knock basis—or at least by arguable probable cause and arguable reasonable suspicion—I respectfully dissent from the decision to dismiss this case for lack of jurisdiction. I would instead enter judgment in favor of Riley on the ground of qualified immunity.